Robert BOHAN, Petitioner,

v.

Robert KUHLMANN, Respondent.

No. 00 CIV.4225 VM.

United States District Court,
S.D. New York.

Aug. 9, 2002.

---

Joel A. Brenner, East Northport, NY, for Petitioner.

Sylvia Wertheimer, Robert M. Morgenthau, District Attorney New York County, New York City, for Respondent.

### DECISION AND ORDER

MARRERO, District Judge.

Petitioner Robert Bohan ("Bohan") was convicted on July 13, 1995, in New York State Supreme Court, New York County (the "Trial Court") for murder in the second degree. On June 7, 2000, Bohan filed a petition for a writ of habeas corpus in this Court, pursuant to 28 U.S.C. § 2254 (" § 2254"), asserting, *inter alia*, that: (1) there was insufficient evidence to sustain his conviction; (2) the Trial Court's preclusion of testimony from an alibi witness violated his rights under the Compulsory Process Clause of the Sixth Amendment; (3) he was deprived of his right to be present at all material stages of the trial; (4) he was denied a fair trial due to prosecutorial misconduct; (5) he was denied effective assistance of counsel at trial; and (6) the Trial Court violated his rights under the Fifth and Fourteenth Amendments by imposing the maximum sentence for his conviction. The Court referred the case to Magistrate Judge James C. Francis IV and on December 28, 2001, he issued a Report and Recommendation (the "Re-

port"), recommending that the writ be granted because Bohan's trial counsel was ineffective and because the preclusion of Bohan's alibi witness violated his Sixth Amendment right to present a defense. The Report is attached and incorporated hereto. For the reasons discussed below, the Court fully adopts the Report and Recommendation of Magistrate Judge Francis and grants Bohan's writ of habeas corpus.

## I. BACKGROUND

On January 12, 1993, at approximately 10:25 p.m., Joseph Alvarez ("Alvarez") was selling crack cocaine under a streetlight in front of 448 West 167th Street in Manhattan when a man wearing a hood shot him twice in the chest and back, killing him. Bohan was indicted for murder in connection with this incident. At trial, the prosecution argued that Bohan committed the murder on account of a dispute that Bohan and his brother, Nicholas, had with Alvarez and an associate of Alvarez named Junior. The dispute had arisen six months earlier during an incident in which Nicholas Bohan punched Junior and Junior pulled out a gun and fired in response. (Tr. at 66.)[1] A prosecution witness named Jamal Williams ("Williams"), who had been a long-time friend of Bohan's, testified that he had witnessed the dispute. After the incident, Williams attended a number of meetings in a nearby McDonald's restaurant with Bohan and Alvarez. According to Williams, in one of the meetings, Bohan threatened to "get" both Williams and Alvarez if they did not help him find Junior. (Tr. at 71.)[2]

Williams and another prosecution witness, Michael Jenkins, further testified that they saw Bohan murder Alvarez on January 12, 1993. Williams said that he was selling crack cocaine with Alvarez and another associate named Manny Martinez ("Martinez") under a street light when Bohan approached, drew a gun, and shot Alvarez. (Tr. at 74.) Williams stated that, before the shooting, he looked straight at Bohan's face from a distance of approximately three feet. (Tr. at 83.) However, Williams also testified that he was with Martinez in the hallway of a nearby building just before Alvarez was shot. (Tr. at 84, 123.) The day after the shooting, Williams identified Bohan in a police line-up as the shooter (Tr. at 77), but during the trial Williams pointed to Bohan's brother when asked to identify the assailant. (Tr. at 66.) Williams also stated that he was scared to testify because he believed that Bohan had "people on the outside." (Tr. at 113.)

Jenkins testified that on the night of the murder, Bohan approached Alvarez, coming within fifteen to twenty feet of Jenkins, and fired three shots. (Tr. at 187.) Unlike Williams, Jenkins identified Bohan in the courtroom as the person who shot Alvarez. Shawn Criss ("Criss"), the Government's third eyewitness from the murder scene, testified that he was six to seven feet away from Alvarez when the shooting occurred. According to Jenkins, it was dark and he "didn't really look" at the shooter. (Tr. at 139.) The only description he could provide was that the assailant was light-skinned, "Spanish looking" and wearing a sweatshirt with his hood up. (Tr. at 141–42.)

---

1. "Tr." refers to the transcript from Bohan's trial.

2. Williams gave contradictory information about who was present during the meetings in McDonald's. (*See* Report at 3.) Furthermore,

other witnesses testified that they attended meetings with Bohan and Alvarez in the same McDonald's, but none of them testified that Williams was present. *Id.*

In defense, Bohan called Carmen Rodriguez ("C.Rodriguez"), who was incarcerated at Rikers Island ("Rikers"), to testify. Because C. Rodriguez had tested positive for tuberculosis, the Trial Court took her testimony via video from a room at Rikers and presented a recording of the testimony to the jury. (Tr. 217, 314.) Bohan was present during her testimony but seated in an adjacent room that contained a glass partition through which he could see the interview.

Prior to the trial, Bohan's attorney, Earl Rawlins ("Rawlins") had asked the Government to interview C. Rodriguez, with the hope that she would disclose information that would persuade the Government to dismiss the charges against Bohan. Assistant District Attorney Stuart Silberg ("Silberg"), did meet with C. Rodriguez at that time and she told him that Bohan did not shoot Alvarez. (Tr. at 25.) However, several days later C. Rodriguez met again with Silberg and Police Detective Michael Vasquez ("Detective Vasquez") and told them that she had lied to Silberg because Bohan's father had promised to take care of her if she testified that Bohan was not the shooter. (Tr. at 432–33, 435–36.) C. Rodriguez then also stated that on the night of the murder, she was talking to Alvarez when Bohan approached and shot him. During her meeting with Silberg and Detective Vasquez, C. Rodriguez also signed a statement indicating that Bohan was the shooter. (Tr. at 433–34.) However, in her trial testimony, C. Rodriguez stated that she neither signed the statement nor told anyone that Bohan had shot Alvarez. (Tr. at 324–25.)

After the Government presented its case-in-chief, Rawlins informed the Trial Court and the prosecution that he intended to call three alibi witnesses: Bohan's grandmother, Julia Feci ("Feci"), and two of Bohan's friends, Roberto Cruz ("Cruz") and Bernardo Rodriguez ("B.Rodriguez"). Although Silberg had requested, long before the trial commenced, that Rawlins provide notice of any alibi witnesses he intended to call, Rawlins had failed to do so, as required by section 250.20 of the New York Criminal Procedure Law ("CPL § 250.20").[3] Silberg consented to both Feci and Cruz testifying at trial because Feci had appeared before the grand jury and had mentioned Cruz's name, thus alerting the prosecution that these two people might be called by the defense. In

---

**3.** The relevant portion of CPL § 250.20 states:
At any time, not more than twenty days after arraignment, the people may serve upon the defendant or his counsel ..., a demand that if the defendant intends to offer a trial defense that at the time of the commission of the crime charged he was at some place or places other than the scene of the crime, and to call witnesses in support of such defense, he must, within eight days of service of such demand, serve upon the people ..., a "notice of alibi," reciting (a) the place or places where the defendant claims to have been at the time in question, and (b) the names, the residential addresses, the places of employment and the addresses thereof of every such alibi witness upon whom he intends to rely. For good cause shown, the court may extend the period for service of the notice....

If at the trial the defendant calls such an alibi witness without having served the demanded notice of alibi, or if having served such a notice he calls a witness not specified therein, the court may exclude any testimony of such witness relating to the alibi defense. The court may in its discretion receive such testimony, but before doing so, it must, upon application of the people, grant an adjournment not in excess of three days.
Both the defendant and the people shall be under a continuing duty to promptly disclose the names and addresses of additional witnesses which come to the attention of either party subsequent to filing their witness lists as provided in this section.

contrast, Silberg claimed that he had never known about B. Rodriguez and objected to his testifying at trial. (Tr. at 222–23, 302–03.)

Feci testified that, on the night of the murder, Bohan and several of his friends, including Cruz, were in her apartment at 640 West 171st Street. She was upset with them because they had damaged her furniture. At one point, she testified that Cruz said goodnight at 10:15 p.m. (Tr. at 232). According to Feci, soon thereafter, Bohan entered her room, apologized for breaking a bed, and watched a television program with her until 11 p.m. (Tr. at 232–33, 246.) Later in her testimony, she said that Cruz left at 10:30 (Tr. at 233, 243) and that Bohan came to her room at 10:45 p.m. and stayed until 11 p.m. (Tr. at 244–47.)

Cruz testified that, on the night of the murder, he was in the apartment with Bohan, Bohan's brother Nicholas, and two other friends named Angel Zapata ("Zapata") and Jason Pena ("Pena"). According to Cruz, soon after 10 p.m., Feci threw him and the other visitors out of her apartment because they had broken a bed. He testified that he said goodnight to Feci at 10:05 p.m. and left ten minutes later. He arrived at his apartment, which was across the street, at 10:30. He later testified that he was unsure of when he left Feci's apartment but he was sure that he reached his apartment by 10:30. (Tr. at 265, 269–70.)

After Cruz testified, Rawlins indicated that he intended to call B. Rodriguez. The Trial Court held a hearing outside the presence of the jury, pursuant to *People v. Dawson,* 50 N.Y.2d 311, 321, 428 N.Y.S.2d 914, 406 N.E.2d 771 (1980), to allow Silberg to inquire into the reason for B. Rodriguez's failure to inform law enforcement authorities that Bohan had not committed the murder. B. Rodriguez testified that on the night of the murder, around 10:05 or 10:10 p.m., he was returning from

work when he saw Cruz, Zapata, Pena and Albert Montilla ("Montilla") standing on the street in front of 640 West 171st Street. (Tr. at 283.) When he approached them, they explained that Feci had thrown them out of her apartment. At that point, which was around 10:10 or 10:15 p.m., B. Rodriguez looked up at the window of Feci's apartment and saw Bohan standing and talking to Feci. (Tr. at 285). According to B. Rodriguez, Bohan seemed upset. (*Id.*) He remained at that location on the street until 11:10 or 11:15 p.m. (Tr. at 284.) B. Rodriguez said he learned two days later that Bohan had been charged with killing someone. (Tr. at 287.) He testified that he did not go to the police to report what he had witnessed because he thought that Bohan had been wrongly accused and that Bohan "was going to come home in a couple of days." (Tr. at 288.)

Approximately one month after the murder, B. Rodriguez learned that the murder victim was from West 167th Street. (Tr. at 291.) He could not recall if anyone told him the victim's name. B. Rodriguez knew that Bohan had been arrested for the murder and had not come home yet. (*Id.*) His family told him to talk to Bohan's attorney. One of his parents told him to talk to the police and the other told him not to. (Tr. at 293.) He testified that he felt he was doing enough by talking to Bohan's attorney. (Tr. at 294.)

Soon thereafter, B. Rodriguez spoke with Rawlins and at his request B. Rodriguez wrote out a statement about what he had seen on the night of the murder. On March 10, 1994, B. Rodriguez faxed the statement to Rawlins. Although Rawlins was required to provide the written statement to Silberg before trial, Rawlins mistakenly asserted that Bohan's previous attorney had received the statement from B. Rodriguez and that he was unaware that

Silberg had not received it.[4] (Tr. at 297.) Silberg asserted that the Trial Court should preclude B. Rodriguez from testifying at trial not only because "defense counsel did not comply with the alibi statute," but also because of "the prejudice ... to the people because we had not had enough time to investigate Mr. Rodriguez." (Tr. at 357.) Silberg further asserted that Bohan would not be prejudiced by the exclusion of B. Rodriguez because the Government had consented to the testimony of two other alibi witnesses, namely Feci and Cruz. (Tr. at 358.) The Trial Court precluded B. Rodriguez's testimony, stating:

> I'm convinced ... [that] this is a violation of the alibi statute and something improper has occurred here. The point of these notices is that you have a right to put on a defense, but [the] People have a right to prevent perjurious testimony from being presented to the jury and the way they can do that is if they have an opportunity to investigate prior—we are at the end of the trial.... No good cause has been given by you for failure to serve an alibi notice, let alone come up with an entirely new witness who your alibi witness in the grand jury did not mention.

(Tr. at 359–60.) Later, Rawlins claimed that B. Rodriguez had in fact come to his office in 1994, but since he was unfamiliar with B. Rodriguez's name at the time, he decided not to do anything with the statement until other alibi witnesses, with whom he was familiar, came forward. Rawlins claimed that he had forgotten about the statement until the morning of the *Dawson* hearing, when he happened to be going through Bohan's file because another alibi witness had called him. (Tr. at 345.)

At the conclusion of the trial on July 13, 1995, the jury found Bohan guilty of murder in the second degree. The Trial Court later sentenced him to the maximum term of imprisonment, which was twenty five years to life. On March 19, 1998, Joel Brenner, Bohan's current attorney, appealed Bohan's conviction to the New York Appellate Division, First Department (the "Appellate Division"), asserting, *inter alia,* that Bohan received ineffective assistance of counsel and that the Trial Court's preclusion of B. Rodriguez violated Bohan's right under both the New York Constitution and the Sixth Amendment of the United States Constitution to present a defense.

In a Memorandum Decision, dated January 12, 1999, the Appellate Division rejected all of Bohan's claims. Regarding the alleged ineffective assistance of counsel, the Appellate Division stated that "defendant received meaningful representation. Counsel's alleged errors could not have deprived defendant of a fair trial." *People v. Bohan,* 257 A.D.2d 443, 684 N.Y.S.2d 514, 515 (1st Dep't 1999) (citation omitted). Regarding the Trial Court's preclusion of B. Rodriguez's testimony, the Appellate Division stated that "[t]he trial court properly exercised its discretion in precluding defendant from calling a third alibi witness, since the defense concededly failed to give proper alibi notice pursuant to [CPL § 250.20] and since the People were deprived of the opportunity to conduct a proper investigation regarding any of the

---

4. There is nothing in the record to suggest that this mistaken assertion was intentional. Bohan did, in fact, have an attorney before Rawlins named Barry Weinstein. (Tr. 298.) Rather, Rawlins mistaken assertion that he did not personally receive the statement is consistent with his explanation that he did not file an alibi notice for B. Rodriguez because he had forgotten about the statement until the morning of the *Dawson* hearing. As discussed below, his mistakes appear to have resulted from carelessness and incompetence rather than any attempt to gain a tactical advantage during the trial.

alibi testimony." *Id.* Bohan appealed the Appellate Division's decision, and on March 15, 1999, the New York Court of Appeals denied Bohan's application for leave to appeal. *See People v. Bohan,* 93 N.Y.2d 871, 689 N.Y.S.2d 433, 711 N.E.2d 647 (1999).

Bohan filed the instant petition on June 7, 2000. Magistrate Judge Francis held hearings on August 2 and October 1, 2001 to "determine whether Bernardo Rodriguez's testimony would have been cumulative had he been permitted to testify at trial and to explore the circumstances of Mr. Rawlins'[s] failure to serve any alibi notice." (Report at 20.) At the August 2, 2001 hearing, Bohan testified that he told Rawlins in November or early December of 1993 that he had an alibi, more than one year before his trial. (Transcript of August 2, 2002 Evidentiary Hearing before Magistrate Judge James C. Francis IV ("First Fed."), at 12.) Bohan told Rawlins that his grandmother, Cruz, Pena, Zapata, Montilla and B. Rodriguez were all alibi witnesses. (First Fed. at 13.) According to Bohan, after his arrest, B. Rodriguez told Feci that he was "downstairs" on the night of the murder. (First Fed. at 13.) When Bohan learned of this from Feci, he told Rawlins about B. Rodriguez. Rawlins asked Bohan for B. Rodriguez's number.

Before the trial, Bohan asked Rawlins if he was going to call B. Rodriguez. Rawlins replied that "he had a witness" from the scene of the murder who would testify that the shooter was not Bohan. (First Fed. at 20.)[5] As discussed above, Rawlins failed to serve the prosecution with an alibi notice as required under New York law. After Bohan was convicted, Rawlins told Bohan that he should appeal on the grounds that the preclusion of B. Rodriguez as an alibi witness was improper. (First Fed. at 14.) According to Bohan, Rawlins told him that "you got a big issue on appeal ... because I fucked up." (First Fed. at 20.)

On cross examination, Silberg presented Bohan with the transcript from his grand jury testimony. Before the grand jury, Bohan had testified that several friends of his, including Cruz and Montilla, had stayed in his grandmother's apartment with him until 11 p.m. (First Fed. at 29.) This grand jury testimony was inconsistent with B. Rodriguez's March 1994 statement and his testimony in state court and at the federal hearing that when he came to the area in front of 640 West 171st Street, he saw a number of friends on the street, including Cruz and Montilla. At the evidentiary hearing before the Magistrate Judge, Bohan claimed that this inconsistency was due to a mistake in the grand jury minutes, as to the time when he testified that Cruz and Montilla were in the apartment. (First Fed. at 30.) Bohan asserted that, before the grand jury, he actually testified that his friends left the apartment around 10 p.m. and the grand jury minutes incorrectly stated 11 p.m. (First Fed. at 28–29.)

After Bohan testified, his counsel called Silberg to testify about information he received from Rawlins before trial. Silberg testified that he knew, from the grand jury minutes, of the potential that Bohan would put on an alibi defense. (First Fed. at 40.) When asked how he became aware of B. Rodriguez, Silberg testified that, on the first day of the trial, as he and Rawlins "were waiting for the jury panel to assemble," Rawlins indicated that: "he had some witnesses to call ..., he believed some of

---

**5.** It appears from the transcript that the witness Rawlins was referring to was C. Rodriguez. (First Fed. at 21.)

those witnesses were alibi witnesses," and that although Silberg was "aware of some of those witnesses because they were mentioned in the grand jury, ... there might be other witnesses as well." (First Fed. at 40–41.) Silberg further testified, "I'm not sure if [Rawlins] actually told me [B.] Rodriguez's name at that time." (First Fed. at 41.) Later in the hearing, Silberg testified that when Rawlins told him about the potential alibi witnesses off the record, he was "troubled by learning about Mr. Rodriguez." (First Fed. at 48.) [6]

Silberg testified that he told Rawlins that he was not happy that he had not received an alibi notice and that they would have to discuss the matter on the record with the judge. (*Id.*) He also stated that he was less concerned about the alibi witnesses whom he knew about and was very concerned about the witnesses he had never heard about. (*Id.*) Silberg already had information on some of the potential alibi witnesses, such as Pena, Zapata, Montilla and Cruz. After the murder, they had been interviewed by Detective Vasquez and had signed statements. The statement of each of these witnesses indicated that, except for Cruz, they were with Bohan in his grandmother's apartment at the time of the murder. (First Fed. at 43.)

According to Silberg, had he known about B. Rodriguez earlier, he would have "checked into it or, if nothing else, at least think about it and factor it into my case ...." (*Id.* at 42.) When Silberg learned about B. Rodriguez, he made inquiries and discovered that he had no criminal record.[7] (*Id.* at 45.) Silberg also spoke with a detective in the homicide investigations

unit who was able to provide Silberg with some information about B. Rodriguez and a relative of B. Rodriguez's who was suspected of having connections with a narcotics dealer. (*Id.* at 46.)

On October 1, 2002, the Magistrate Judge conducted a second hearing to allow Rawlins to testify. Rawlins indicated that he never provided Silberg with notice for any of the alibi witnesses that he called at trial, although they discussed the issue. (Transcript of October, 2002 Evidentiary Hearing before Magistrate Judge James C. Francis IV ("Second Fed."), at 3–4.) When asked why he did not comply with the notice requirement of the alibi statute, Rawlins stated: "I did not recall having specific information prior to the time that I had reviewed the file, just before the trial, and found a specific worthwhile letter in there that would be useful to have testimony, alibi testimony." (Second Fed. at 4.) According to Rawlins, once he became aware of B. Rodriguez's letter, he told Silberg that he had alibi witnesses to call. (*Id.*) On cross examination, Silberg asked Rawlins whether he was wary about providing information about B. Rodriguez because he was afraid that it "wouldn't work out well if [Silberg] had an opportunity to speak with Mr. Rodriguez." (Second Fed. at 7.) Rawlins replied, "no it's the contrary—I would be more than happy to give you that letter so you could check it out." (*Id.*) Silberg also asked Rawlins if he told Bohan that he "fucked up with the alibi in the case." (Second Fed. at 10.) Although Rawlins could not specifically recall whether he told Bohan that he had made a

---

6. In the Report, the Magistrate Judge correctly notes that it appears from the trial transcript that Silberg actually first heard of B. Rodriguez's name at the *Dawson* hearing on July 12, 1995, seven days after the jury selection. (*See* Report at 25 (citing Tr. at 303, 355)).)

7. Silberg could not recall whether the other potential alibi witnesses, such as Cruz, Zapata, Montilla and Pena, had criminal records. (First Fed. at 47.)

mistake, he testified that he told Bohan that his alibi defense presented an appealable issue. (*Id.*) During the hearing, Rawlins conceded that his handling of Bohan's alibi defense "certainly was a mistake." (*Id.*)

On December 28, 2001, the Magistrate Judge issued a seventy-four page Report and Recommendation, which carefully analyzed each of the grounds that Bohan raised in his petition. The Report concludes that: (1) there was sufficient evidence to support Bohan's conviction; (2) his absence from the examination room during the questioning of C. Rodriguez did not affect the fairness of his trial and was, at most, harmless error; (3) the Trial Court's rulings on the admissibility of statements by witnesses that they were afraid did not violate Bohan's constitutional rights; (4) the prosecutor did not engage in misconduct during his summation; and (5) the trial judge did not violate Bohan's Fifth Amendment rights when she sentenced him. However, on Bohan's two remaining claims, the Magistrate Judge concluded that: (1) the Trial Court's preclusion of alibi testimony violated the Compulsory Process clause of the Sixth Amendment of the United States Constitution; and (2) Rawlins's failure to comply with the alibi notice statute deprived Bohan of effective assistance of counsel. As a result, the Magistrate Judge recommended that the writ be granted. On January 4, 2002, Bohan filed objections to the Report, asserting, among other things, that the Report: (1) fails to consider "internal inconsistencies" in certain testimony before concluding that there was sufficient evidence to sustain Bohan's conviction; and (2) incorrectly concludes that Bohan's exclusion from the room where C. Rodriguez testified was subject to a harmless error analysis. On January 30, 2002, respondent Robert Kuhlmann, Superintendent of the Sullivan Correctional Facility (the "State") filed objections to the Report, asserting, *inter alia*, that: (1) the Report does not accurately convey the import of the trial evidence; and (2) Bohan is not entitled to habeas corpus relief based on the preclusion of B. Rodriguez's testimony or on the alleged ineffective assistance of counsel.

## II. DISCUSSION

### A. STANDARD OF REVIEW

#### 1. The Report and Recommendation

The Federal Magistrate Act provides that a district judge may "designate a magistrate to conduct hearings, including evidentiary hearings" in order to "submit to a judge of the court proposed findings of fact and recommendations for the disposition ... of applications for post-trial relief made by individuals convicted of criminal offenses ...." 28 U.S.C. § 636(b)(1)(B) (2000). In reviewing the Report, this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(2000); *see* Fed.R.Civ.P. 72(b). Any party may object to the Magistrate Judge's findings and recommendations. *See id.* If an objection is timely filed, as is the case here, the Court is bound to make a "*de novo* determination of those portions of the report ... or recommendations to which objection is made." *Id. See United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). Having conducted a careful *de novo* review of the Magistrate Judge's well-reasoned Report, and of the objections by Bohan and the State, the Court fully adopts the findings and recommendation of the Report. The majority of issues raised by Bohan are meritless and the Court declines to add to

the findings of the Report.[8] However, because Bohan's two meritorious claims present significant issues, the Court addresses them below.

### 2. *Exhaustion*

■ A federal court may entertain a petition for a writ of habeas corpus only where the petitioner has first "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A) (2000). *See Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir.1994); *Daye v. Attorney General of New York*, 696 F.2d 186, 190 (2d Cir.1982). This requirement mandates a habeas petitioner to have "fairly presented" in state court the claims that are raised in the habeas petition. *Picard*, 404 U.S. at 275, 92 S.Ct. 509. *See Duncan v. Henry*, 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Strogov v. Attorney General of New York*, 191 F.3d 188, 191 (2d Cir.1999), *cert. denied*, 530 U.S. 1264, 120 S.Ct. 2723, 147 L.Ed.2d 987 (2000); *Gonzalez v. Sullivan*, 934 F.2d 419, 422 (2d Cir.1991).

### 3. *AEDPA*

The Court notes that, because Bohan's petition was filed after the effective date of the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), this action is governed by the habeas statute as amended. *See Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254. Pursuant to the various sub-sections of § 2254, this Court's review is guided by certain restrictions on the nature and extent of review that a federal court can conduct in considering a habeas petition.

■ In a habeas corpus proceeding, "a determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1) (2000). Petitioner, however, may rebut the presumption by clear and convincing evidence. *See id.* Consequently, this Court presumes that the factual findings of the New York courts are correct and will not set aside those findings unless "the material facts were not adequately developed at the State court hearing" or the court's factual determinations are not fairly supported by the record. *Smith v. Mann*, 173 F.3d 73, 76 (2d Cir.1999).

### 4. *AEDPA's "Contrary to" and "Unreasonable Application" Prongs*

As amended, Section 2254(d) of the AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1) (2000). The United States Supreme Court recently decided the proper interpretation of § 2254(d)(1) and the manner in which a federal court is to consider the legal conclusions of a state

---

**8.** More specifically, having reviewed the record and Bohan's objections, the Court finds that: (1) there was sufficient evidence for a rational juror to conclude, beyond a reasonable doubt, that Bohan committed the charged murder; (2) Bohan's exclusion from the room where C. Rodriguez testified did not violate his constitutional rights; (3) the prosecutor did not engage in misconduct; and (4) the Trial Court's imposition of the maximum sentence did not violate Bohan's rights under the Fifth and Fourteenth Amendments of the United States Constitution.

court. *See Williams*, 529 U.S. at 362, 120 S.Ct. 1495. The Court held that § 2254(d)(1) defines two categories of cases, each with independent meaning, in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. *See id.* at 404–06, 120 S.Ct. 1495. Parsing the explicit text of the statute, the Court stated that a federal court may grant a writ of habeas corpus if the state court decision is either (1) "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." *Id.*

A state court's decision may be held contrary to clearly established Supreme Court precedent in either of two occasions: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Id.* at 405–06, 120 S.Ct. 1495. Regarding the "unreasonable application" prong of § 2254(d)(1), the Court held that a state court decision involves an unreasonable application of its precedent "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 407, 120 S.Ct. 1495. The Court further commented that:

> [A]n unreasonable application of federal law is different from an incorrect application of federal law.... Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 411, 120 S.Ct. 1495. The relevant inquiry under this clause, therefore, is "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495.

The Court further addressed the meaning of the phrase "clearly established Federal law." *See id.* at 412, 120 S.Ct. 1495. The phrase restricts the source of clearly established law exclusively to the Supreme Court's jurisprudence—"the holdings, as opposed to dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *See id.* Accordingly, this Court, sitting as a federal habeas court in reviewing Bohan's petition, is guided by and restricted to applicable United States Supreme Court precedent. Because this Court concludes that the New York state courts adjudicated Bohan's claims on the merits, the Court finds that *Williams* does apply to this case.

**B. PRECLUSION OF BOHAN'S ALIBI WITNESS**

1. *The Sixth Amendment Right to Present a Defense*

■ Under the Sixth Amendment to the United States Constitution, every criminal defendant has "the right to ... have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. Pursuant to the Sixth Amendment, criminal defendants have a right to "the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before the jury evidence that might influence the determination of guilt." *Taylor v. Illinois*, 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)

(quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). Every person accused of a crime has a fundamental right to present witnesses in his own defense. *See id.* (citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Such a right is an "essential attribute of the adversary system itself." *Id.* The right to compel a witness's presence in the courtroom could not protect the "integrity of the adversary process if it did not embrace the right to have the witness's testimony heard by the trier of fact." *Id.* at 409, 108 S.Ct. 646. It is well-settled that an accused person's right to present witnesses in his defense is fundamental:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)).

However, this right is not unlimited. *See id.* at 410, 108 S.Ct. 646; *see also Noble v. Kelly*, 89 F.Supp.2d 443, 454 (2000), *aff'd*, 246 F.3d 93 (2d Cir.), *cert denied*, 534 U.S. 886, 122 S.Ct. 197, 151 L.Ed.2d 139 (2001). For example, a court may limit the presentation of evidence if it is concerned about "harassment, prejudice, confusion of the issues, the witness's safety or interrogation that is repetitive or only marginally relevant." *Noble*, 89 F. Supp 2d at 454 (quoting *Delaware v. Van Ars-*

dall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). As the Supreme Court stated in *Taylor*:

> The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.... The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.

484 U.S. at 410–11, 108 S.Ct. 646.

In a criminal trial, the state clearly has a very strong interest in the orderly presentation of evidence that will assist a trier of fact to ascertain the truth. Such an interest includes "protecting itself against an eleventh-hour defense." *Id.* at 411, 108 S.Ct. 646. To achieve this end, New York, like many other states, has enacted an alibi-notice statute, requiring defendants to provide the prosecution with notice if they intend to pursue an alibi defense and call witnesses to this end. *See* CPL § 250.20. The Supreme Court has specifically approved of such a statute, as applied in a particular case in Florida:

> Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions, dating at least from 1927, are now in existence in a substantial number of States. The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an

absolute right always to conceal their cards until played.

*Williams v. Florida*, 399 U.S. 78, 81–81, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

In the instant case, the Appellate Division rejected Bohan's claim that the Trial Court's preclusion of B. Rodriguez's testimony violated his right to compulsory process under the Sixth Amendment. In his Report, the Magistrate Judge concluded that the Appellate Division's denial of this claim was "contrary to ... clearly established federal law," as the term is used in § 2254(d)(1). (*See* Report at 62.) The Report states: "By not considering 'whether defense counsel had wilfully or in bad faith failed to comply with the alibi notice requirement,' the Appellate Division did not follow Supreme Court precedent as established in *Taylor*, 484 U.S. at 415, 108 S.Ct. 646." (*Id.*) (quoting *Noble*, 89 F.Supp.2d at 461.) The Magistrate Judge further found that even if the "unreasonable application" clause of § 2254 were controlling, "it would not alter the results." (Report at 62–63.) Furthermore, the Magistrate Judge concluded that the Trial Court's error of precluding the testimony of B. Rodriguez was not harmless.

The State makes numerous objections to the Report's findings that the Trial Court's preclusion of testimony from B. Rodriguez was constitutional error that prejudiced Bohan's defense. It asserts that: 1) the Report did not correctly apply the deferential standard of review mandated by AEDPA;[9] 2) the Report incorrectly concluded that the state court's rejection of Bohan's Sixth Amendment claim was "contrary to" or "an unreasonable application" of the Supreme Court's opinion in *Taylor*; 3)

even if the state court did violate Bohan's constitutional rights, the Report incorrectly found that the error was prejudicial. For the reasons discussed below, the Court disagrees with each of the State's objections.

In its objections to the Report, the State asserts that "to the extent that it purported to analyze petitioner's claims under the AEDPA standard of review, the Report did not correctly apply the relevant components of that standard." (*See* Respondent's Objections to the Magistrate Judge's Report and Recommendation, dated January 25, 2002 (the "State's Obj."), at 14.) In support of this argument, the State contends that the "contrary to" clause of § 2254 does not apply "since the state court decision did 'not explicitly refer to either the federal claim or the relevant federal caselaw,' the federal courts are not in a position to know what the Appellate Division did or did not consider in rejecting that claim." (State's Obj. at 14 (quoting *Sellan*, 261 F.3d at 311).) This argument is misplaced. *Sellan* does not support the State's proposition that the decision of a state court is immune to being "contrary to" established federal law simply because the state court failed to articulate its analysis. In fact, the Second Circuit held the opposite to be true. *See Sellan*, 261. F.3d at 312 ("We recognize that a state court's explanation of the reasoning underlying its decision would ease our burden in applying the 'unreasonable application' or 'contrary to' tests. However, the absence of an explanation does not absolve us from performing the same task.").

**9.** The Court agrees with the State's assertion that Bohan's claims were "adjudicated on the merits," such that the AEDPA standard of review applies. *See Sellan v. Kuhlman*, 261 F.3d 303, 310 (2d Cir.2001). However, the Court notes that the Magistrate Judge's Report essentially agrees with this assertion and applied this standard of review. (*See* Report at 60 ("[Bohan's claim] appears to have been adjudicated on the merits").)

The State also asserts that, even if the "contrary to" language in § 2254 applies to the instant case, the Magistrate Judge "did not correctly interpret and apply the relevant components of that standard." (State's Obj. at 14.) The Court disagrees. In a decision that pre-dated *Taylor,* the Second Circuit held that alibi testimony is so critical that it cannot be excluded notwithstanding procedural defaults, even when, as in the instant case, counsel "offered the court no reasonable explanation" for failure to comply with the state notice requirements for alibi testimony. *Escalera v. Coombe,* 826 F.2d 185, 188 (2d Cir. 1987) (*"Escalera I"*). The Supreme Court vacated *Escalera I* and remanded the case for reconsideration, in light of its analysis in *Taylor. See Coombe v. Escalera,* 484 U.S. 1054, 108 S.Ct. 1004, 98 L.Ed.2d 971 (1988). The Second Circuit, in turn, remanded the case to the district court for further inquiry consistent with *Taylor:*

> [The district court judge] did note in his opinion below that the attorney's "apparent bad faith—or, at least, the absence of a good excuse—[wa]s evident" in the failure properly to give notice of his intent to call [an alibi witness]. But this alone is not enough. *The absence of a good excuse is not necessarily commensurate with "willful" conduct* and it is not readily clear whether Escalera's attorney was, in fact, motivated by a desire to obtain a tactical advantage.

*Escalera v. Coombe,* 852 F.2d 45, 48 (2d Cir.1988) (per curiam) (*"Escalera II"*) (quoting *Escalera v. Coombe,* 652 F.Supp. 1316, 1324 (E.D.N.Y.1987)) (emphasis added).

In *Noble,* the district court addressed a similar issue: Whether a state court's preclusion of alibi witness testimony violated a defendant's compulsory process rights under the Sixth Amendment. *See Noble,* 89 F.Supp.2d at 454–59. There, during the petitioner's trial in state court, his counsel had attempted to call an alibi witness, whose name he had failed to disclose to the prosecution in a timely manner, as required by CPL § 250.20. *See id.* at 448. The trial court granted the prosecution's application to exclude the alibi testimony, due to defense counsel's failure to comply with CPL § 250.20. *See id.* In doing so, the trial court considered and rejected defense counsel's assertion that preclusion was unnecessary because a short adjournment would provide the prosecution with sufficient time to prepare for the unnoticed alibi witness. *See id.* at 449.

On habeas review, the federal district court held that the trial court's failure to inquire into the willfulness of defense counsel's conduct violated the defendant's Compulsory Process rights under the Sixth Amendment. *See id.* at 457. ("[W]here, as is the case here, the record discloses no indication that the trial court ever considered whether defense counsel's failure to comply with the notice requirement was designed to frustrate the truth-seeking function of the trial, we conclude that the court's exclusion of the alibi evidence violated the defendant's rights under the Compulsory Process Clause."). The district court concluded that this finding was "reinforced by the minimal degree of prejudice that an alternative sanction would have caused the prosecution." *Id.* More specifically, the court found that: (1) during the state trial in question, "unlike the typical alibi defense," the prosecution had a "wealth of evidence about the place where the defendant claimed to have been and about other witnesses who might contradict that testimony;" (2) since the alibi witness in question was "proffered after the close of the prosecution's case," no prosecution witnesses would have been inconvenienced by a brief delay; and (3) had the trial court allowed the alibi witness to testify, but granted the prosecution addi-

tional time to prepare a cross-examination or to adduce rebuttal testimony, "the record from which the jury would be asked to render a verdict would have been more complete and accurate, not less." *Id.*

■ The Second Circuit affirmed, stating that "under the circumstances of this case, the state trial court could have used less onerous sanctions (such as an adjournment) to minimize any prejudice to the prosecution, and that *a finding of willfulness was therefore required* to justify the exclusion of [the precluded witness's] testimony." *Noble*, 246 F.3d at 100 (*citing Noble*, 89 F.Supp.2d at 457) (emphasis added). However, the Second Circuit explicitly declined to address the level of willfulness that would provide a trial court with sufficient grounds to properly exclude alibi testimony:

> We [ ] need not decide whether, and to what extent, a finding of willfulness is required in every case. For purposes of the present case, we need only conclude that where prejudice to the prosecution can be minimized with relative ease, a trial court's exclusion of alibi testimony must be supported by a finding of some degree of willfulness in defense counsel's violation of the applicable discovery rules.

*Noble*, 246 F.3d at 100 n. 3. Accordingly, under the reasoning of *Noble*, if the Trial Court in the instant case could have used less onerous sanctions to minimize any prejudice to the prosecution, some finding of willfulness was required to justify the exclusion of the testimony of B. Rodriguez.[10]

■ Applying this standard, the Magistrate Judge found that: (1) "the trial court could have minimized any prejudice to the prosecution with a short adjournment;" (2) "the prosecution in this case had a wealth of evidence about the place where the defendant claimed to have been and about other witnesses who might contradict Mr. Rodriguez's testimony;" and (3) "Mr. Rodriguez 'was proffered as a witness after the close of the prosecution's case and so no prosecution witnesses would have been inconvenienced by a short delay.' ' (Report at 58 (quoting *Noble*, 89 F.Supp.2d at 457).) The Magistrate Judge also found that there was no evidence that Rawlins's failure to "give notice of Bernardo Rodriguez was willful or motivated by a desire to gain a tactical advantage." (Report at 53.) The Court agrees. Crediting Bohan's statement about Rawlins's explanation for failing to provide notice concerning B. Rodriguez's alibi testimony, and Rawlins's own apparently equivocal reasons, the record convincingly supports a finding that Rawlins simply mishandled the matter

---

**10.** Citing the Supreme Court's ruling in *Williams*, the State asserts that the Second Circuit's decision in *Noble* is irrelevant to the instant petition because "only Supreme Court precedent is relevant under the AEDPA, and *Noble* was not a decision of the Supreme Court." (State's Obj. at 15.) *Williams*, however, does not indicate that a district court is required, or even permitted, to disregard the Circuit's interpretation of "clearly established Federal law, as determined by the Supreme Court . . . ." 28 U.S.C. § 2254. Such a reading of *Williams* is inconsistent with the history and structure of our federal courts. Furthermore, subsequent to the Second Circuit's decision in *Noble*, at least one appellate state court in New York has acknowledged that "under the federal standard, if the explanation proffered by [a] defendant for the untimely application to file alibi notice reveals that the omission was willful and motivated by a desire to obtain a tactical advantage, the witness's testimony may be properly excluded." *People v. Walker*, 743 N.Y.S.2d 403, 404 (1st Dep't 2002). The logical implication of *Walker* is that if the defendant's proffered explanation does not reveal that the omission was willful, the witness's testimony may not be excluded.

as opposed to a finding that he sought to achieve some tactical advantage.

The State contends that the Report's conclusion that the prejudice from the testimony of an unnoticed alibi witness could have been minimized by a short adjournment was "erroneous." (State's Obj. at 24–25.) However, in *Noble* the Second Circuit did not state that, under the facts of that case, a short adjournment would have eliminated all prejudice to the prosecution. It merely stated that the prejudice to the prosecution *could* have been minimized with relative ease. The same is true in the instant case. Although it is not entirely clear that Silberg had a "wealth of evidence" about the relevance of people loitering on the street below Feci's apartment, the Court agrees with the Report that the Trial Court could have minimized any prejudice to the prosecution with a short adjournment and that the prosecution's witnesses would not have been inconvenienced by a short delay. If the accounts of all of Bohan's alibi witnesses, including B. Rodriguez, were clearly a sham, as the State contends (*see* State's Obj. at 24), then impeachment of these witnesses should not have been as difficult as the State maintains. Cruz had already testified and Montilla was present during parts of the trial. (*See* State's Obj. at 24 n. 15.) The State could have used a short adjournment to prepare for further questioning of these two individuals.[11]

The State also maintains that the Report is incorrect in its conclusion that neither the Trial Court nor the Appellate Division made any findings about the willfulness of Rawlins's conduct. (State's Obj. at 21 n. 13.) The Court disagrees. When the Trial

Court precluded B. Rodriguez's testimony it stated: "I'm precluding this witness. It's a clear violation of the Statute. And in my discretion, you have not given me good cause why this man's name [was] not served as an alibi...." (Tr. at 308.) Rawlins later tried to argue that the State was improperly reserving its objections for defense witnesses who had no criminal record. In response, the Court stated:

> You are mixing apples and oranges. I'm more convinced this is a violation of the alibi statute and something improper has occurred here. The point of these notices is that you have a right to put on a defense, but [the] People have a right to prevent perjurious testimony from being presented to the jury and the way [that] they can do that is if they have an opportunity to investigate prior [to trial].

(Tr. at 359–360.) Although the Trial Court stated that it was convinced that "something improper has occurred," it made no further inquiries into the reasons for Rawlins's failure to provide "good cause" for not serving an alibi notice. *See Escalera II*, 852 F.2d at 48 ("The absence of a good excuse is not necessarily commensurate with willful conduct ....") (quotation omitted). Furthermore, by emphasizing that the "People have a right to prevent perjurious testimony from being presented to the jury," the Trial Court suggested that what it considered "improper" may have been B. Rodriguez's potential fabrication of testimony. There is simply nothing in the record to indicate that the Trial Court made any clear findings, considered or intended as such, with respect to Rawlins's

---

**11.** The Court also questions the level of difficulty the State would have faced in calling Zapata and Pena, who were both incarcerated at the time of the trial. There is no indication that Bohan or anyone associated with him attempted to meet with these potential witnesses before or during trial and again, if B. Rodriguez's account of events was fabricated, as the State maintains, then testimony by these two individuals potentially could have revealed that falseness to the jury.

willfulness, or that Rawlins's failure to comply with the notice requirements of the alibi statute was due to anything more than defense counsel's ill-preparation and blunder.

### 2. *Harmless Error*

 When a defendant's constitutional rights have been violated due to trial error, habeas relief is warranted only if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).[12] As noted in the Report, the Second Circuit has recently articulated the proper standard for a harmless error analysis of witness preclusion:

> [W]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether "the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." In a close case, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." On habeas review, trial errors are subject to lenient harmless error review. The creation of otherwise non-existent reasonable doubt satisfies the "substantial and injurious" standard [of *Brecht* ].

*Washington v. Schriver,* 255 F.3d 45, 56–57 (2d Cir.2001) (quoting *Jones v. Stinson,* 229 F.3d 112, 120 (2d Cir.2000)). In his Report, the Magistrate Judge concluded that "Mr. Rodriguez's testimony places the petitioner at home during the time period

unaccounted for by other witnesses, thus providing critical support to Mr. Bohan's alibi. . . ." (Report at 67.)

In its objections to this aspect of the Report, the State contends that even if the preclusion of B. Rodriguez's testimony violated Bohan's constitutional rights, contrary to the findings of the Report, any error was harmless. (*See* State's Obj. at 31.) In support of this position, the State essentially reiterates arguments that were thoroughly considered and rejected by the Magistrate Judge. It asserts that: (1) the Report understates the strength of testimony identifying Bohan as the murderer; (2) the Report ignores the obvious biases of the alibi witnesses; (3) B. Rodriguez's testimony would have added nothing to the credibility of other alibi witnesses; and (4) B. Rodriguez's failure to approach law enforcement authorities earlier would have drastically undermined the credibility of his testimony. (*See* State's Obj. at 32–33.) In spite of these objections, the Court agrees with the Report's conclusion that the preclusion of B. Rodriguez as an alibi witness was not harmless error.

As the Report notes, "[i]n his summation, the prosecutor argued that the testimony from the two alibi witnesses was not inconsistent with the prosecution's theory of the case, because neither could account for the petitioner's whereabouts from a little after 10:00 to 10:45 p.m.; thus giving him enough time to commit the murder." (Report at 66.) During summation, Silberg told the jury:

> The most important thing about Ms. Feci in the context of the defendant's case . . . is [that] she was too late. . . . She says [she saw the defendant at]

---

**12.** The Court agrees with the Report that, because the Appellate Division found that the instant case presented no constitutional error, the issue of harmlessness was not adjudicated on the merits. (*See* Report at 64 n. 29.) As a

result, the Court need not address the question of whether the *Brecht* standard applies to post-AEDPA claims that are adjudicated on the merits. *See Noble,* 246 F.3d at 101 n. 5.

10:45, the murder occurred four or five blocks away at 10:25, so there is enough time to commit the murder and get back.... You heard from Roberto Cruz, too early. He said he's playing video games and leaves defendant around 10:00 ....

When you put the two witnesses together [Feci and Cruz] ... what you get is too early and too late. Defense calls the grandmother and Roberto Cruz, they didn't call [Zapata], [Pena] or [Montilla], didn't call any of the other people .... Why aren't they calling the people with the defendant at the time of the crime?

(Tr. at 517–18.) It is somewhat disingenuous for the State to now claim that, in making this argument, the prosecutor was only trying to "refrain from a direct, frontal assault on the credibility of petitioner's 79–year old, hard-of-hearing grandmother, and on that of petitioner's long-time friend." (State's Obj. at 35.) Had the prosecutor felt that a "direct, frontal assault" of the alibi testimony would have been more effective in persuading the jury of the State's case, it is highly unlikely that he would have refrained from utilizing such a tactic. Instead, a review of the record reveals that the gap in time, highlighted by the prosecutor on summation "bore on an issue that [was] plainly critical to the jury's decision; ... was material to the establishment of the critical fact [and was not] instead ... cumulative; and [concerned issues] emphasized in arguments to the jury." (Report at 68 (quoting *Wray v. Johnson,* 202 F.3d 515, 526 (2000)).) *See also Noble,* 89 F.Supp.2d at 458–59. B. Rodriguez would have testified that he saw Bohan and Feci in the window of the apartment at approximately 10:10 or 10:15 and that he stayed on the street until 11:10 or 11:15. (Tr. at 284–85.) If the jury had credited his testimony, it could have potentially bolstered the testimony of Bohan's other alibi witnesses who maintained that he was in Feci's apartment at the time when the murder occurred.

The State's argument that "Bernardo's time estimate is more realistically viewed as a deliberate contrivance to help his long-time friend ..." (State's Obj. at 36), is of no consequence. As noted in the Report, the degree to which B. Rodriguez's credibility was affected by his interests and by inconsistent statements by other witnesses is a matter for the jury, not the Court. As the Supreme Court has stated:

> [T]he conviction of our time is that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court.... [W]e believe that [this] reasoning [is] required by the Sixth Amendment.

*Washington v. Texas,* 388 U.S. at 21, 87 S.Ct. 1920 (quoting *Rosen v. United States,* 245 U.S. 467, 471, 38 S.Ct. 148, 62 L.Ed. 406 (1918)); *United States v. Doyle,* 130 F.3d 523, 543 (2d Cir.1997). If the jury, or any single member of it, were to credit B. Rodriguez's testimony even partially, so that it created a reasonable doubt about Bohan's guilt, he would have been acquitted or entitled to a new trial. The Court thus finds that the record in this case presents a "grave doubt" as to whether the Trial Court's preclusion of B. Rodriguez's testimony was harmless. *O'Neal v. McAninch,* 513 U.S. 432, 436–37, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Accordingly, the Court concludes that Bohan's writ for habeas corpus must be granted because: (1) the Trial Court violated Bohan's Sixth Amendment right to compulsory process when it precluded the testimony of B. Rodriguez, absent a finding of willful miscon-

duct; and (2) the Trial Court's error was not harmless.

In reaching this conclusion, the Court is mindful that the record here gives cause for some hesitation. As the Report correctly notes, there was more than sufficient evidence presented at trial for a rational juror to conclude that Bohan committed the murder in question. (*See* Report at 29–30.) The jury may very well have discredited the testimony of B. Rodriguez, but, given the critical importance of the timing of events in this case, the Court does not find that this outcome was as inevitable as the State asserts. Ironically, although the prosecution adamantly maintained at trial that it would be prejudiced by the presentation of B. Rodriguez's testimony, it now asserts that the same testimony would have been cumulative and inherently incredible. When, as in the instant case, rulings by a state court manifesting constitutional error create grave doubts about their effect on a petitioner's guilty verdict, a federal court has an obligation to grant a writ of habeas corpus. *O'Neal,* 513 U.S. 432, 436–37, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) ("[I]n cases of grave doubt as to harmlessness the petitioner must win"). Although the State has valid interests in the orderly presentation of evidence and preserving its ability to fully prepare for the testimony of alibi witnesses, such interests cannot override a defendant's fundamental right to present witnesses in his defense, absent a finding a willfulness or bad-faith by the defendant or his counsel. *See Noble,* 246 F.3d at 100; *cf. In re Winship,* 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) ("In a criminal case, . . . we do not

view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty. . . . [T]he requirement of proof beyond a reasonable doubt in a criminal case is bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.").

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

In his petition, Bohan asserts that Rawlins made numerous mistakes before and during trial that amounted to ineffective assistance of counsel. With regard to nearly all of these alleged mistakes, the Report concluded that Bohan "has not established that 'but for' these failings, the outcome of the trial would have been different." (Report at 49–50 (citing *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))). With respect to Rawlins's failure to serve the prosecution with alibi notices, however, the Report concluded that his conduct fell "outside of the wide range of professionally competent assistance," and that there is "more than a 'reasonable probability'" that the trial result would have been different 'but for' [his] errors." (Report at 71 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.)) The Report also found that Bohan had exhausted his state remedies for his ineffective assistance claims, since he raised them in his direct appeal to the Appellate Division. (*See* Report at 46–47.) The Court agrees.[13]

Under *Strickland,* a petitioner who seeks a reversal of his conviction for ineffective assistance of counsel must establish

---

**13.** After conducting a *de novo* review of Report's findings, the Court agrees that nearly all of Bohan's grounds for ineffective assistance of counsel are insufficient to warrant the granting of a writ of habeas corpus. Because Rawlins's failure to serve alibi notices presents a more difficult question, the Court addresses this aspect of Bohan's ineffective assistance claim below.

that: (1) counsel's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) the deficient performance prejudiced the defense, meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. With respect to the first element, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052. With respect to the second element, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

In the instant case, the State contends that: (1) the Report erroneously concludes that Bohan exhausted his ineffective assistance claims in state court; and (2) Rawlins's deficient performance did not prejudice the defense because B. Rodriguez's alibi testimony was "unreliable and even had it been admitted, would not have affected the outcome of the trial." (State's Obj. at 39.) [14]

Under New York Criminal Procedure Law, § 440.10 ("CPL § 440.10"), a convicted defendant may move a sentencing court to vacate his judgment on the ground that "material evidence adduced by the people at a trial resulting in judgement was procured in violation of the defendant's rights under the constitution of [New York] or of the United States . . . ." CPL § 440.10(1)(d). The State maintains that Bohan's "failure to pursue his ineffective assistance claim in the state courts by way of a motion under CPL § 440.10 contravenes the firmly entrenched New York rule that only by such a motion can a proper record be developed with respect to factual issues that cannot be resolved based on the appellate record alone." (State's Obj. at 39.)

The Court finds that, contrary to the State's objection, Bohan exhausted his ineffective assistance of counsel claim. It is well-settled that "once the state courts have ruled upon a claim, it is not necessary for a petitioner 'to ask the state for collateral relief, based upon the same evidence and issues already decided by direct review.'" *Castille v. Peoples,* 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989) (quoting *Brown v. Allen,* 344 U.S. 443, 447–449, 73 S.Ct. 397, 97 L.Ed. 469 (1953)). Once the Appellate Division rejected Bohan's ineffective assistance claim and the Court of Appeals denied leave to appeal, he had exhausted this claim in state court. *See Castille,* 489 U.S. at 351, 109 S.Ct. 1056; *Meggett v. Miller,* 93 Civ. 7402, 1994 WL 808048, *5 (S.D.N.Y. July 23, 1994) ("[E]ven if the petitioner failed to comply with state procedural requirements, he will be deemed to have exhausted his state-court remedies if the highest state court nonetheless addresses the claim.").

The Court also agrees with the Report's conclusion that there is more than a "reasonable probability" that the

---

**14.** The state presents no objections with respect to the Report's findings that Rawlins's failure to serve an alibi notice "was caused by his sheer ineptitude" and that his conduct "clearly falls outside of the wide range of professionally competent assistance." (Report at 71 (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.)) Accordingly, the Court adopts this aspect of the Report and need not conduct a *de novo* review of the first prong of the *Strickland* analysis.

trial result would have been different "but for" Rawlins's deficient performance as Bohan's trial counsel. As discussed above in Part B.2, if Rawlins had properly filed a notice for B. Rodriguez's alibi testimony and the jury had heard his testimony, there is at least a reasonable probability that the outcome of the trial might have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. In reviewing this claim on direct appeal, the Appellate Division came to the opposite conclusion: "On the existing record, which [Bohan] has not sought to amplify by a motion pursuant to CPL 440.10, we conclude that defendant received meaningful representation. Counsel's alleged errors could not have deprived defendant of a fair trial." *Bohan,* 684 N.Y.S.2d at 515 (citing *People v. Benevento,* 91 N.Y.2d 708, 674 N.Y.S.2d 629, 697 N.E.2d 584, 587–88 (1998)). In *Benevento,* although the New York Court of Appeals acknowledged that *Strickland* established the federal standard for an ineffective assistance of counsel claim, it applied its own standard that pre-dated *Strickland. See Benevento,* 674 N.Y.S.2d 629, 697 N.E.2d at 589. Under the New York Constitution, a claim of ineffectiveness is "ultimately concerned with fairness of the process as a whole rather than its particular impact on the outcome of a case.... Thus, whether defendant would have been acquitted on the charges but for counsel's errors is relevant, but not dispositive under the State guarantee of effective assistance of counsel." *Id.* at 588. As noted in the Magistrate Judge's Report, this standard is not "diametrically different" from the standard under *Strickland.* (See Report at 72–73 (citing *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495).) In fact, the New York standard is more expansive than *Strickland* and would provide relief to some defendants who would not be entitled to relief under federal law.

Accordingly, the Court agrees with the Reports' conclusion that the Appellate Division's denial of Bohan's ineffective assistance claim was "an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court ...." 28 U.S.C. § 2254(d)(1). The Appellate Division incorrectly concluded that Rawlins's failure to serve the prosecution with an alibi notice for B. Rodriguez's testimony "could not have deprived [Bohan] of a fair trial." *Bohan,* 684 N.Y.S.2d at 515. As discussed above, if the jury had credited B. Rodriguez's testimony even partially, there is a reasonable probability that the outcome of the trial would have been different.

## III. CONCLUSION AND ORDER

For the reasons set forth above, it is hereby

**ORDERED** that Bohan's petition for a writ of habeas corpus is GRANTED.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

To The Honorable Victor Marrero, District Judge.

FRANCIS, United States Magistrate Judge.

Robert Bohan brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for murder in the second degree following a jury trial before the Honorable Bonnie Wittner in New York State Supreme Court, New York County. He argues that: (1) there was insufficient evidence to support the conviction; (2) the preclusion of testimony from an alibi witness violated his right to present a defense as guaranteed by the Compulsory Process Clause of the Sixth Amendment; (3) he was deprived of his right to be present during all

material stages of the trial; (4) he was denied a fair trial due to prosecutorial misconduct; (5) he was denied effective assistance of counsel; and (6) the trial court imposed the maximum sentence in violation of his Fifth and Fourteenth Amendment rights. Because Mr. Bohan's counsel was ineffective in failing to serve an alibi notice and because the preclusion of that witness denied the petitioner his right to present a defense, I recommend that the writ be granted.

*Background*

At about 10:25 p.m. on January 12, 1993, Joseph Alvarez was selling crack cocaine on the street in front of 448 West 167th Street in Manhattan when a man wearing a hood approached and shot him twice in the chest and back, killing him. (Tr. 44–45, 73, 138–39, 141, 210, 226).[1] There had been an ongoing dispute among Mr. Alvarez; the petitioner; the petitioner's brother, Nicholas Bohan; and another drug dealer known as Junior who was an associate of Mr. Alvarez. At some point prior to the murder, the petitioner's brother had punched Junior, who responded by firing a gun at him. (Tr. 36, 66).[2] Afterwards, Robert and Nicholas Bohan met with Mr. Alvarez several times to obtain his help in finding Junior, but Mr. Alvarez apparently demurred. (Tr. 67, 71–72). The prosecution argued that this motivated the petitioner to murder him. (Tr. 36–38, 515).

A. *Prosecution Witnesses*[3]

1. *Jamal Williams*

The prosecution presented the testimony of three eyewitnesses at trial, the first of whom was Jamal Williams, a long-time friend of Mr. Alvarez. (Tr. 62–63). He saw Junior shoot at the petitioner's brother, and sometime after the incident Mr. Williams and Mr. Alvarez met with Robert and Nicholas Bohan and a friend of the Bohans in a McDonald's restaurant.[4] According to Mr. Williams, Robert Bohan warned that if Mr. Alvarez and Mr. Williams did not help him find Junior, he would "get" both of them. (Tr. 66–68, 71). Two other prosecution witnesses also testified that they had gone with Mr. Alvarez when he met with the petitioner at McDonald's, but they contended Mr. Williams was not present. (Tr. 152–53, 167–68, 170–72). Mr. Williams further testified that he had seen Mr. Bohan about three times a week for six weeks prior to the murder, though in his grand jury testimony he claimed to have only seen him a total of three or four times. (Tr. 92–94, 105).

On the night of the murder, Mr. Williams was selling crack cocaine with Mr. Alvarez and a man named Manny Martinez. (Tr. 63). He denied using the drug that evening but admitted to having smoked marijuana. (Tr. 64, 81). Mr. Williams said that he was on the street standing three feet away from Mr. Alvarez when a man wearing a "cap" approached

---

1. "Tr." refers to the trial transcript.

2. Although the prosecutor said in his opening statement that it was the petitioner who had been shot at by Junior, it is undisputed that it was the petitioner's brother. (Respondent's Appellate Brief, included as Exh. B in Appendix in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("Resp.App."), at 3).

3. Only the testimony of those prosecution witnesses relevant to the habeas petition is described here.

4. Mr. Williams gave contradictory information about who was present at McDonald's. On direct and cross-examination, he first stated that he met with the petitioner's brother (Mr. Williams referred to him as Mike although his true name is Nicholas), not the petitioner, but then identified the petitioner as having been present. (Tr. 66–68, 70, 92–94).

Mr. Alvarez, uttered a few words, and then shot him. (Tr. 73–75, 89). However, Mr. Williams told the grand jury he had been in the hallway of a building rolling a marijuana cigarette with Mr. Martinez when the shots were fired, although he claimed that he could see what was going on in the street. (Tr. 83–84, 123). Mr. Williams also testified at trial that the assailant wore black pants and a black and white leather jacket, but had earlier given a statement to the police indicating the shooter was wearing blue jeans. (Tr. 79, 86). Additionally, during the trial he described the gun used as silver with a black handle (Tr. 98), but before the grand jury, he denied having seen the gun. (Tr. 100).

The day after the murder, Mr. Williams identified the petitioner as the shooter in a line-up. At trial, he also named the shooter as Robert Bohan but identified the petitioner's brother, who was in the courtroom, as the assailant. (Tr. 66–68, 457–58). Subsequently, he denied that the perpetrator was in the courtroom. (Tr. 68–69). Mr. Williams then admitted that the person who shot Mr. Alvarez was the petitioner's brother, whom Mr. Williams incorrectly called Mike Bohan. (Tr. 93). Finally, Mr. Williams claimed Robert Bohan committed the murder. (Tr. 118).

MR. SILBERG: Mr. Williams, you scared?

MR. WILLIAMS: Yes, I am.

MR. SILBERG: What are you scared of?

MR. WILLIAMS: My life.

MR. SILBERG: Why is that?

MR. WILLIAMS: Because he got people on the outside.

MR. RAWLINS: Objection. Move to strike.

THE COURT: Overruled. Come up, please.

[Attorneys approach sidebar for a discussion out of the hearing of the witness and the jury.]

THE COURT: First of all, I want to put on the record what occurred, which I think I'm correct. I'll stand corrected if I'm not. Right before the break, Mr. Rawlins was cross-examining and the witness started crying and couldn't answer any further questions. In addition, my observations have been that throughout this trial there have been at least two brothers, three sisters and maybe the father here staring at this witness and they're constantly going in and out of the Courtroom. It was also reported to me that they're reporting to someone outside the Courtroom who is a potential witness for the defense.

. . . . .

MR. RAWLINS: . . . . I'm moving for a mistrial. Basically the People have elicited the fact that there is some fear of the witness.

THE COURT: You got him to say, aren't you testifying because you want to help out poor Joey [Alvarez]'s mother. He didn't know what he was saying. I find [the petitioner's family] very menacing. I said to the Court Officers last week, and I'm not a fearful person, and I said I want to be escorted outside of this Courtroom.

MR. RAWLINS: What do you know about my client that would make you feel that way?

THE COURT: Nothing. Just the way they're presenting themselves. It's a public courtroom. They have a right to be here. I can make my observations. There's something about them, the way they look at this witness— particularly in light of your cross that this is fair redirect. Plus the grand jury testimony. This man said he was

threatened—this defendant threatened all 3 of them. He threatened all 3 of them if they didn't give him Junior's whereabouts.

MR. RAWLINS: That's [Mr. Williams'] testimony.

. . . . .

THE COURT: If the jury doesn't believe it that's fine. It is a question of fact for the jury to determine.

(Tr. 113–17).

### 2. *Shawn Criss*

On the night of the murder, the second eyewitness, Shawn Criss, was selling drugs six to seven feet away from Mr. Alvarez. According to Mr. Criss, the assailant walked up to the victim, said "You remember me, faggot," and shot him three or four times. (Tr. 138–39, 141, 143). Mr. Criss only glanced at the shooter and "didn't really look at him," but was able to tell that the shooter was "white, Spanish looking" and wearing a "hoody" covering his entire head. (Tr. 139, 141–43, 147). When asked at trial to identify the culprit, Mr. Criss stated that he did not recognize anybody even though the petitioner was in the courtroom. The prosecutor then asked, "Are you scared being here today?" and Mr. Criss agreed. (Tr. 142–43). Mr. Criss also admitted that he was facing felony drug charges but was allowed to plead to a misdemeanor after he agreed to testify for the prosecution. (Tr. 135–36).

### 3. *Michael Jenkins*

The last eyewitness presented by the prosecution was Michael Jenkins. Mr. Jenkins, who was also selling crack on 167th Street on the night of the murder, testified before the grand jury that he was unable to identify the shooter because the assailant's head was covered by a "hoody."

(Tr. 180, 198–99). However, at trial he testified that the petitioner shot Mr. Alvarez (Tr. 183–84), even though on cross-examination he admitted that he could not clearly see the shooter's face. (Tr. 192).

He also said that Mr. Williams was on the block when the shots were fired (Tr. 187), and that the only person standing near Mr. Alvarez was Mr. Criss. (Tr. 204). As with Mr. Criss, Mr. Jenkins was also facing drug charges that were reduced prior to his testifying. (Tr. 195–97).

### B. *Defense Witnesses*

### 1. *Carmen Rodriguez*

At the time of the trial, Carmen Rodriguez was incarcerated at Rikers Island and was being held in the Contagious Diseases Unit ("CDU") because she had tested positive for tuberculosis. In light of her medical condition, the trial court took her testimony at the CDU and presented it to the jury via videotape. (Tr. 217, 314). Present at the facility were the trial judge, Justice Wittner; the prosecutor, Mr. Silberg; the defense attorney, Mr. Rawlins; the petitioner; Ms. Rodriguez; her attorney; the stenographer; and a video technician. At the start of the examination of Ms. Rodriguez, the judge said, "So the way we are going to do this is defendant will stay in this room, I will, you[5] and Mr. Silberg and Mr. Rawlins will be in the room with the witness and her attorney, Ms. Davidson." (Tr. 217). Ms. Rodriguez testified that she had known Mr. Alvarez for seven years and the petitioner for three to four years. Although she used drugs, she was not taking them when the shooting occurred. (Tr. 316, 318, 336). When Mr. Alvarez was shot, she claimed she was standing two feet away but could not see the shooter's face clearly because he was wearing a hood. (Tr. 317, 341–42). Nevertheless, she knew it was not the

---

**5.** It is unclear from the record who "you" refers to.

petitioner because the shooter was short (approximately 5'2") and had dark skin. (Tr. 317–18, 331, 342).[6]

Prior to trial, Mr. Rawlins had invited the prosecution to interview Ms. Rodriguez in the hopes of getting the charges against the petitioner dismissed. (Tr. 214). When first interviewed by the prosecution, Ms. Rodriguez had maintained that the petitioner was not the shooter. (Tr. 25, 437). However, during a subsequent interview with Police Officer Michael Vasquez, she disclosed she had lied because the petitioner's father had promised to take care of her if she testified the petitioner was not the shooter. (Tr. 432–33, 435–36). She then gave a written statement implicating the petitioner as the shooter. (Tr. 434–35). During the examination at Rikers Island, Ms. Rodriguez claimed that this statement was not written by her and denied both that the petitioner's father ever contacted her and that the petitioner committed the murder. (Tr. 319, 324–29).

At the conclusion of the examination, the following occurred:

THE COURT: On the record. I want to put on the record Mr. Rawlins consulted with his client and gave him the opportunity to be in the room with Ms. Rodriguez and Mr. Rawlins and he declined that. Is that right?

MR. RAWLINS: Yes.

THE COURT: You had an opportunity to talk to him both before and after?

MR. RAWLINS: Yes.

(Cond.Ex. Tr. 29).[7]

2. *Alibi Witnesses*

Just after the prosecution rested, Mr. Rawlins informed the court and the prosecution that he planned to call three alibi witnesses: the petitioner's grandmother, Julia Feci, and two friends of the petitioner, Roberto Cruz and Bernardo Rodriguez. (Tr. 222–23). Although Mr. Rawlins did not give the prosecutor alibi notices for the witnesses as required by state law, the prosecutor consented to both Ms. Feci and Mr. Cruz testifying because Ms. Feci had previously testified in the grand jury proceeding and had mentioned Mr. Cruz's name in her testimony, thus alerting the prosecution to the possibility of their being called as witnesses. The prosecutor, however, objected to Mr. Rodriguez testifying because he had been unable to interview this witness before trial since his name had never come up in any prior proceedings. (Tr. 222–23, 302–03).

a. *Julia Feci*

Ms. Feci, who was 79 years old, testified that the petitioner was living with her at 640 171st Street at the time of the murder. That night the petitioner was home with several of his friends, and Ms. Feci was upset with them because they had damaged some of her furniture. (Tr. 228–29, 231–32). First, she said that one of the petitioner's friends, Roberto Cruz,[8] said goodnight to her at 10:15 p.m., at which point she checked in on the petitioner in his room. (Tr. 232). "A little while later" the petitioner came into her room to apologize for breaking a bed, and the two sat by the window and watched the conclusion of a television show that ended at 11:00 p.m.

---

6. The petitioner is apparently 5'11" and white. (Memorandum of Law in Support of the Petition for a Writ of Habeas Corpus ("Pet. Memo.") at 12 n. 14).

7. "Cond. Ex. Tr." refers to the transcript from the Conditional Examination of Carmen Rodriguez included as Exh. D in Resp.App.

8. Throughout Ms. Feci's testimony, she referred to Mr. Cruz by his nickname, "Pidge."

(Tr. 232–33, 246).[9] She later claimed Mr. Cruz said goodnight to her at 10:30 p.m. (Tr. 233, 243), and the petitioner came in to her bedroom at the same time and remained there until 11:00 p.m. (Tr. 234). Finally, she testified the petitioner did not come into her room until 10:45 p.m. and stayed until 11:00 p.m. to finish watching the program with her. (Tr. 244–47).

### b. *Roberto Cruz*

According to Roberto Cruz, on January 12, 1993, he was at Ms. Feci's apartment with Robert and Nicholas Bohan and two other friends, Jason and Angel. (Tr. 253). Soon after 10:00 p.m., Ms. Feci threw the visitors out of the apartment because they had broken a bed. He claimed he said goodnight to Ms. Feci at 10:05 p.m. and left ten minutes later with Angel and Jason. He arrived at home, which was across the street, before 10:30 p.m. (Tr. 254, 263–65). Later, he admitted he was not sure what time he left Ms. Feci's apartment but was confident he arrived home before 10:30 p.m. (Tr. 265, 269–70).

### c. *Dawson Hearing* [10]

Before the prosecutor made any objection to the introduction of Bernardo Rodriguez's testimony, the trial court held a *Dawson* hearing to determine whether Mr. Rodriguez could be cross-examined about his failure to report the murder to the police. During the hearing, Mr. Rodriguez testified that on his way home from work the night of January 12, 1993, he spotted his friends, Roberto Cruz, Jason, Albert, and Angel, in front of 640 171st Street, and went over to greet them. (Tr. 283). They explained to him that Ms. Feci had thrown them out of her apartment, at which point Mr. Rodriguez looked up and observed the petitioner in the window of Ms. Feci's second-floor apartment. This was at approximately 10:10–10:15 p.m. Mr. Rodriguez said Roberto Cruz left the block early to go to work, but he remained with his friends on 171st Street until 11:00 or 11:15 p.m. (Tr. 284–85).

Mr. Rodriguez found out about the murder two days later from his brother-in-law, Charlie Abarka, also a friend of the petitioner's, but never went to the police. (Tr. 285–86, 288). After the petitioner's lawyer contacted Mr. Rodriguez, he gave the attorney a written statement about what had happened the night of January 12. (Tr. 289, 296). This statement, which had a fax date of March 10, 1994, was never provided to the prosecutor. (Tr. 297). Mr. Rawlins, the petitioner's third attorney, claimed that he had not taken the statement from Mr. Rodriguez although it was in his file. (Tr. 297–98). When questioned about the origin of the statement, Mr. Rodriguez responded that he made the statement at Mr. Rawlins' request sometime in 1993 or 1994 and then faxed it to him. (Tr. 300–01). He was emphatic about not having spoken with any other attorneys. (Tr. 301–02).

When the prosecutor indicated that he might not consent to Mr. Rodriguez testifying, Mr. Rawlins countered that the prosecution was selectively objecting to witnesses and did not want Mr. Rodriguez to testify because, unlike other witnesses, he did not have a criminal history. The

**9.** Ms. Feci first testified that the program aired from 11:00 p.m. to 12:00 a.m. (Tr. 239), but her later testimony makes clear that the show was broadcast from 10:00 p.m. to 11:00 p.m. (Tr. 244–46).

**10.** A *Dawson* hearing is held to determine whether the prosecutor may cross-examine a witness about the witness' failure to relay exculpatory information to law enforcement officials. *See People v. Dawson*, 50 N.Y.2d 311, 321, 428 N.Y.S.2d 914, 921, 406 N.E.2d 771 (1980).

judge responded, "[The prosecution is] bending over backwards so this won't later become ineffective assistance of counsel on appeal. I've ordered them to do more than they are required to do. I did more than I am required to do so this will not be overturned on an issue like that." (Tr. 305–06). Later Justice Wittner continued,

> [The statement from Mr. Rodriguez] is a year sitting in a defense file since February '94. It is a 3 page written statement from a witness who you did not serve alibi notice. It is outrageous, not to mention the fact that you did not turn over the prior written statement. I'm precluding this witness. It's a clear violation of the Statute. And in my discretion you have not given me good cause why this man's name is not swerved [sic] as an alibi ruling.

(Tr. 308). Mr. Rawlins then tried to argue that Mr. Rodriguez was not an alibi witness because the time of the murder had not been established, an argument the judge quickly dismissed. (Tr. 309).

After a recess, Mr. Rawlins admitted that he had met with Mr. Rodriguez in 1994, but that because he was unfamiliar with Mr. Rodriguez's name and had not come across it in any of the records, he decided not do to anything further with the statement until the other alibi witnesses, with whom he was familiar, came forward. (Tr. 344–45). Mr. Rawlins then claimed to have forgotten about Mr. Rodriguez until he went back through his file the morning of the hearing, after one of the other alibi witnesses had contacted him. (Tr. 345).

The next day, the prosecution presented additional reasons why Mr. Rodriguez should not testify based on the investigation conducted after his identity was revealed. Mr. Silberg produced a photograph of Mr. Rodriguez's brother-in-law, Mr. Abarca,[11] and the petitioner brandishing guns, and stated that Mr. Abarca was involved in a drug gang with the petitioner. Based on this limited inquiry, Mr. Silberg argued that a more thorough investigation was needed. (Tr. 355–58). Justice Wittner then reaffirmed her ruling and precluded Mr. Rodriguez from testifying based on Mr. Rawlins' failure to show good cause for not having served any alibi notice. (Tr. 360).[12]

### C. *Prosecution's Closing Statement*

During the prosecutor's summation, the following transpired:

> MR. SILBERG: Now, speaking about Jamal Williams, I don't think anyone here has any doubt that Jamal Williams was not scared. I don't think anyone has any doubt that anyone who testifies in a criminal case who saw a murder would not be scared to testify. He indicated he was scared of the defendant and the defendant's people.
>
> Mr. Rawlins will tell you he still stayed in the neighborhood. He's still out on the street.
>
> Ladies and gentlemen, .... [y]ou observed him when he broke down crying. Wasn't that because he was scared? When he couldn't go on wasn't it because he was scared? Ask yourselves, ladies and gentlemen, was

---

11. Mr. Silberg referred to Mr. Rodriguez's brother-in-law as Juan Abarca, whereas Mr. Rodriguez called him Charlie in his testimony. (Tr. 286, 356)

12. One other witness, Jose Rivera, testified for the defense. Mr. Rivera, who was a friend

of the petitioner's, stated that he was talking on a phone on 167th Street when the murder occurred. Although he could not identify the shooter, he maintained that it was not the petitioner. (Tr. 364–65, 403, 415).

Jamal Williams lying to you or was he scared about the consequences of him testifying and pointing someone out in a murder trial. Also make no mistake when he pointed out the defendant who else was in the audience? The defendant's father and the defendant's brother [were] in the audience. It's not an enviable task to sit on the stand and point out the murderer with his family even sitting right behind him. You better believe Jamal Williams was scared as anyone would be scared.

. . . . .

Now, Mr. Jenkins was an interesting witness because Mr. Jenkins was considerably more self-assured, more confident, he didn't break down crying, didn't get upset and one thing you might want to notice is when you compare Jamal to Jenkins, when Jamal testified he told you he was scared to death. Mike Jenkins didn't indicate he was too scared. One of the differences between when Jamal testified and when Mike Jenkins testified is the defendant's father was present when Jamal testified, defendant's brother was present when Jamal testified, and neither one of them were present when Mike Jenkins testified, so consider the fact how much pressure there was on Jamal and how much less pressure there was on Mike because while he had to face [the] defendant, he didn't have to face [the] defendant's family. He didn't have to worry about that.

MR. RAWLINS: Objection.

THE COURT: Sustained to the last part.

. . . . .

MR. SILBERG: [Mr. Criss] didn't identify the defendant. Whether Mr. Criss actually saw the person's face is something for you to determine or whether he was just too scared to say who the person was is something for you to consider.

(Tr. 493–94, 505, 513–14).

### D. *Verdict and Sentence*

On July 13, 1995, the jury found Mr. Bohan guilty of murder in the second degree. (Tr. 351, 570). He was later sentenced to the maximum term of imprisonment, twenty-five years to life. (Sent. Tr. 19–20).[13] Throughout the sentencing proceeding, the petitioner maintained his innocence. (Sent. Tr. 14–16). In handing down her sentence, Justice Wittner found that

> when a young man commits a murder like this without provocation, after he's been in Family Court, after he's been in the Dome Project, after he's had probation, I have no other choice but to give a sentence that I feel reflects the seriousness, the violence [of] this crime, and the lack of remorse of this defendant.

(Sent. Tr. 19).

### E. *Post-trial Proceedings*

On March 19, 1998, Joel Brenner, the petitioner's current attorney, filed an appeal on Mr. Bohan's behalf. He argued that: (1) the conviction was not supported by sufficient evidence; (2) Mr. Bohan received ineffective assistance of counsel; (3) his right to be present during all material stages of the trial had been violated; (4) the prosecutor committed misconduct throughout the trial; (5) a ruling allowing the prosecutor to question the petitioner

---

**13.** "Sent. Tr." refers to the transcript from the sentencing proceeding held on October 11, 1995.

about his previous drug dealing was reversible error; (6) preclusion of testimony from an alibi witness violated Mr. Bohan's right to present a defense both under the state Constitution and the Sixth Amendment of the federal Constitution; and (7) his sentence was excessive.

The Appellate Division, First Department affirmed the conviction, finding that (1) there was sufficient evidence of guilt; (2) on the existing record the defendant received "meaningful representation;" (3) the conditional examination of Carmen Rodriguez was "unreviewable" because the petitioner failed "to provide a sufficient record to establish that the special seating arrangements deprived him of the right to be present" and because he had waived his right to be situated in the same room as the witness; (4) "[t]he trial court properly exercised its discretion in precluding [the] defendant from calling a third alibi witness, since the defense concededly failed to give proper alibi notice ... and since [the prosecution was] deprived of the opportunity to conduct a proper investigation regarding any of the alibi testimony;" (5) there was no "abuse of sentencing discretion" and the sentence was "not based on any improper criteria;" and (6) all remaining contentions were meritless. *People v. Bohan*, 257 A.D.2d 443, 443–44, 684 N.Y.S.2d 514, 515 (1st Dep't 1999). On March 15, 1999, the Court of Appeals denied leave to appeal. *People v. Bohan*, 93 N.Y.2d 871, 689 N.Y.S.2d 433, 711 N.E.2d 647 (1999). Mr. Bohan then filed the instant petition.

### F. *Hearing in Federal Court*

I held a hearing on August 2 and October 1, 2001, to determine whether Bernar-

do Rodriguez's testimony would have been cumulative had he been permitted to testify at trial and to explore the circumstances of Mr. Rawlins' failure to serve any alibi notice. The petitioner also elicited testimony about the examination of Carmen Rodriguez. The following is a summary of testimony given at the hearing.

#### 1. *Robert Bohan*

Mr. Bohan testified he told Mr. Rawlins about his alibi and the names of witnesses who could verify his whereabouts including, Jason, Angel, Albert, Ms. Feci, Roberto Cruz, and Bernardo Rodriguez. (First Fed. Tr. 13).[14] Contrary to what he said to the grand jury, Mr. Bohan claimed that his friends all left the house around 10:15 p.m.[15] (First Fed. Tr. 18, 23). According to Mr. Bohan, Mr. Rawlins acknowledged at sentencing that he had "fucked up" the alibi. (First Fed. Tr. 14).

Mr. Bohan also said that during the examination of Carmen Rodriguez, he and the video technician were in a separate room from Ms. Rodriguez, the judge, and counsel. (First Fed. Tr. 33). The rooms were separated by a plexiglass window so that all parties could see each other and speakers were set up so that the petitioner could hear the proceeding. (First Fed. Tr. 21–22, 33–35). Mr. Bohan denied that Mr. Rawlins asked him if he wanted to be seated in the same room during the examination and denied ever hearing Mr. Rawlins waive his right to be present. (First Fed. Tr. 33–34).

#### 2. *Bernardo Rodriguez*

Mr. Rodriguez testified he had lived on 172nd Street his whole life. At the time of

---

**14.** "First Fed. Tr." refers to the transcript from the hearing held before the Court on August 2, 2001.

**15.** In the grand jury proceedings, the petitioner testified that Roberto Cruz and Albert did

not leave the apartment until around 11:00 p.m., and Angel and Jason stayed until after 11:00 p.m. to help fix the bed. (Grand Jury Testimony of Robert Bohan, included as Exh. G in Resp.App., at 30, 125).

the hearing, he was an instructor at Intermediate School 90 and a candidate to become a police officer in the Suffolk County Police Department. (First Fed. Tr. 67–68). He had no criminal history but was issued a summons for turnstile jumping, which was subsequently dismissed. (First Fed. Tr. 76–77).

His testimony regarding the night of January 12, 1993, was very similar to that which he gave at the *Dawson* hearing in state court. Mr. Rodriguez said that after he got off work at City College, he went to 171st Street. He arrived there sometime around 10:10 p.m. (First Fed. Tr. 70). Roberto Cruz explained to him that several of their friends had gotten thrown out of Mr. Bohan's apartment. (First Fed. Tr. 72, 91). He then looked up at the window at approximately 10:15 p.m. and saw the petitioner and his grandmother in a window that faced out onto the street on the second floor of the building. (First Fed. Tr. 72–73, 91–92). In addition to Mr. Cruz, Angel, Jason, and Albert were also on the street. (First Fed. Tr. 89). Mr. Cruz left soon after Mr. Rodriguez arrived, and when Mr. Rodriguez left at 11:15 p.m.,[16] only Albert and Angel were still on the street. (First Fed. Tr. 74, 87–88, 94–95).

### 3. *Michael Vasquez*

Officer Michael Vasquez stated that he interviewed Albert Montilla, Jason Pena, Angel Zapata, and Roberto Cruz about the petitioner's alibi.

Albert Montilla, who was fourteen at the time of the interview, gave a signed statement detailing how from 8:30 to 11:30 p.m. he was with the petitioner, Roberto, Jason, and Angel at the Bohans' apartment. (First Fed. Tr. 108, 117). Also present in

the home were the petitioner's grandmother, mother, and one sister. (First Fed. Tr. 127). According to Mr. Montilla, he stayed until 11:30 p.m., but Mr. Cruz left at 10:30 p.m. (First Fed. Tr. 108; Resp. Exh. B).[17] There was no mention of Bernardo Rodriguez in his statement. (First Fed. Tr. 109).

Jason Pena, who was fifteen at the time of the interview (First Fed. Tr. 123), gave a signed statement declaring that he had arrived at the Bohans' apartment at around 8:00 or 8:30 p.m. and stayed until 12:30 a.m. with Angel to fix the broken bed. Mr. Cruz left earlier, at 10:00 or 10:30 p.m., and Albert left at 11:00 or 11:20 p.m. (First Fed. Tr. 110; Resp. Exh. C). Mr. Pena did not mention Mr. Rodriguez, Ms. Feci, or any other Bohan family members. (First Fed. Tr. 124–25).

In his signed statement, Angel Zapata, who was fifteen at the time, reported that he was in the Bohans' apartment from 8:30 p.m. to approximately 12:30 a.m. with the petitioner, Roberto Cruz, Albert, Jason, and Nicholas Bohan. (First Fed. Tr. 111–12, 126). Roberto left at around 10:30 p.m.; Albert left at approximately 11:30 p.m.; and Jason and he left at about 12:30 a.m. (First Fed. Tr. 112). There was no mention of Mr. Rodriguez or Ms. Feci having been present, but Mr. Zapata did state that Mr. Bohan's sisters were in the apartment. (First Fed. Tr. 112; Resp. Exh. D).

Officer Vasquez also interviewed Roberto Cruz, but was called to another crime scene and was unable to have Mr. Cruz complete or sign his statement. Nevertheless, Mr. Cruz, who was 23 years old at the time of the interview, did tell the officer

---

**16.** During the hearing, it came out that in a previous statement given by Mr. Rodriguez he claimed to have left the block to go home at 10:45 p.m. (First Fed. Tr. 88).

**17.** "Resp. Exh." refers to exhibits admitted during the evidentiary hearing held in this Court.

that he arrived at the apartment at 8:00 or 8:30 p.m., and stayed there with Albert, Jason, Angel, Nicholas, and the petitioner. (First 113–14, 128). While there, he overheard an argument between the petitioner and his grandmother about a broken bed. (Resp.Exh. E). He left to go home around 10:30 p.m., leaving Robert and his friends. (Resp.Exh. E).

It is unclear from the written police reports whether Officer Vasquez or his partner ever asked the witnesses if they saw anyone on the street after leaving the apartment. (First Fed. Tr. 120, 133).

### 4. Stuart Silberg

Mr. Silberg testified that Mr. Rawlins first notified him that he would be calling alibi witnesses during a discussion off the record that took place before the jury had been selected, approximately seven to ten days before Mr. Rawlins attempted to call Mr. Rodriguez as a witness. (First Fed. Tr. 40–42, 45–46). It is unclear if Mr. Rawlins gave Mr. Silberg any of the names of these witnesses at that time, although it is undisputed that he did not disclose Mr. Rodriguez's name.[18] After the prosecution had rested, Mr. Rawlins informed the court he wanted to call Mr. Rodriguez as a witness. That same day Mr. Silberg ran a rap sheet on him. (First Fed. Tr. 45–46; Tr. 303, 305). Mr. Silberg also contacted a police investigator for information about a relative of Mr. Rodriguez's who was a friend of the petitioner's and who was apparently involved in dealing drugs. (First Fed. Tr. 46). During the 24–hour period between the time Mr. Silberg first became aware of Mr. Rodriguez and when the trial judge precluded his testimony, Mr. Silberg never sought to interview Mr. Rodriguez. (First Fed. Tr. 50, 63–64).

### 5. Earl Rawlins

Mr. Rawlins testified that he never gave written alibi notice but that he did have conversations with Mr. Silberg prior to the trial about calling alibi witnesses. (Second Fed. Tr. 3–4).[19] He claimed his failure to give notice was not motivated by any desire to gain tactical advantage, but rather because he had forgotten about the alibi witnesses until he reviewed his file immediately before the trial. (Second Fed. Tr. 4, 11). When asked why he did not give notice as soon as he realized he had a statement from Mr. Rodriguez giving the petitioner an alibi, Mr. Rawlins responded, "At that point, I just told Mr. Silberg, I recall, I have this person here, and then that's it. I don't recall what I—no, I'm not sure what I did or not, to tell you the truth." (Second Fed. Tr. 4).

On cross-examination Mr. Silberg tried to elicit testimony about defense counsel's possible motivation for failing to provide notice and suggested that Mr. Rawlins did not give notice because of his experience with Carmen Rodriguez who had changed her testimony after speaking to the prosecution. When Mr. Silberg tried to present this theory of Mr. Rawlins' failure to provide notice, the following exchange occurred:

> MR. SILBERG: So would it be fair to say as a result of you giving us a

---

**18.** In the federal court proceeding, Mr. Silberg intimated that he was specifically aware of Mr. Rodriguez before the jury was selected. (First Fed. Tr. 40–41, 45–46). However, the trial transcript makes clear that Mr. Silberg first heard of Mr. Rodriguez the same day as the *Dawson* hearing, July 12, 1995, seven days after the jury was selected. (Tr. 303, 355; Post–Hearing Memorandum in Support of Answer Opposing Petition for a Writ of Habeas Corpus ("Resp. Post–Hearing Memo."), at 8 n. 8).

**19.** "Second Fed. Tr." refers to the transcript from the hearing held before this Court on October 1, 2001.

witness [Carmen Rodriguez] who[m] you thought might convince us to dismiss the case that that didn't happen?

MR. RAWLINS: The case was not dismissed, that's correct.

MR. SILBERG: Now, when you became aware of Bernardo Rodriguez, were you a little wary about letting us have information about him, because you were afraid that that wouldn't work out well if we had an opportunity to speak to Mr. Rodriguez?

MR. RAWLINS: No, it's the contrary. As I reviewed the letter—I would be more than happy to give you that letter so you could check it out, yes.

(Second Fed. Tr. 7). Mr. Rawlins denied that he disbelieved Mr. Rodriguez's account of the events. (Second Fed. Tr. 9). He maintained he did not attempt to call the other alibi witnesses—Jason, Albert, and Angel—because he thought they were in jail at the time. (Second Fed. Tr. 8).[20]

Mr. Rawlins also acknowledged that his failure to give alibi notice was a mistake:

MR. SILBERG: Did you go back and tell [Mr. Bohan] that—if you'll pardon my language, that you fucked up with the alibi in the case? Do you remember telling him that?

MR. RAWLINS: Using the word fucked up, I don't know. I would certainly mention the fact that that would be an appealable issue, yeah, and I spoke to him about it, oh, yeah.

MR. SILBERG: That you might have mentioned to him, in discussing what the next steps would be, that in filing an appeal that would be an issue.

MR. RAWLINS: Yeah.

MR. SILBERG: But you don't have a direct recollection of telling him that you made a mistake in handling [the] alibi.

MR. RAWLINS: I don't recall telling him, but it certainly was a mistake.

(Second Fed. Tr. 10).

Finally, when questioned about whether he had asked the petitioner to sit at the counsel table during the interview with Carmen Rodriguez, he answered that he had no recollection. (Second Fed. Tr. 4–5).

*Discussion*[21]

**A. *Insufficient Evidence***

■ Mr. Bohan claims there is insufficient evidence of his guilt. He maintains that the testimony of the alleged eyewitnesses was internally contradictory and was belied by other prosecution witnesses. This argument is without merit.

There is a "very heavy burden placed upon a defendant challenging the sufficiency of the evidence underlying his conviction." *Knapp v. Leonardo,* 46 F.3d 170, 178 (2d Cir.1995) (internal quotations and citation omitted). To succeed the petitioner must demonstrate that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999), *cert. denied,* 528 U.S. 1170, 120 S.Ct. 1196, 145 L.Ed.2d 1100 (2000); *Knapp,* 46 F.3d at 178.

In this case, two eyewitnesses, Michael Jenkins and Jamal Williams, testified that

**20.** This is confirmed in part by the state trial transcript, which indicates that Jason and Angel were incarcerated at the time of the trial. (Tr. 260–61, 275–76).

**21.** Because the claims unrelated to the preclusion of the alibi witness fail under *de novo* review, it is unnecessary to discuss whether the Anti–Terrorism and Effective Death Penalty Act's more deferential standard applies to them. *See* 28 U.S.C. § 2254(d)(1).

it was the petitioner who shot Mr. Alvarez. Any inconsistent or contradictory testimony by these witnesses does not render their identification of Mr. Bohan incredible, because the evidence must be construed in the light most favorable to the prosecution and this Court must defer to the jury's resolution of any conflicts in the testimony and its assessment of witness credibility. *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

With regard to the defense witnesses, a rational juror could have discounted Carmen Rodriguez's testimony that Mr. Bohan was not the assailant because she changed her account of the events twice. One of the alibi witnesses, Mr. Cruz, last saw the petitioner before the crime occurred and could not vouch for his whereabouts at the time of the shooting, while the other witness, Ms. Feci, provided several time-frames for the critical events, at least one of which did not provide an alibi for the petitioner. Finally, three prosecution witnesses testified that the petitioner had met with the victim, and one of them, Mr. Williams, stated that the petitioner had threatened Mr. Alvarez, providing a motive for the killing. Based on all of this evidence, and in particular the eyewitness identifications of the petitioner, a rational juror could have found him guilty beyond a reasonable doubt.

### B. *Right to be Present During All Material Stages of Trial*

The petitioner argues that his absence from the room at Rikers Island while Carmen Rodriguez was interviewed by the judge and counsel violated his right to be present during all material stages of the trial. Although his attorney stated on the record that the petitioner had waived his right to be present, Mr. Bohan denies that counsel spoke to him about this issue. The respondent counters that this claim is not exhausted and should be dismissed or, in the alternative, that it fails on the merits. Although this claim is exhausted, it is meritless.

### 1. *Exhaustion*

▮ Pursuant to 28 U.S.C. § 2254(b)(1)(A), a petitioner must exhaust all state remedies to the highest state court. *See also Gonzalez v. Sullivan,* 934 F.2d 419, 422 (2d Cir.1991); *Daye v. Attorney General of the State of New York,* 696 F.2d 186, 190–91 & n. 3 (2d Cir.1982). To achieve exhaustion, the petitioner must inform the state court of both the legal and factual bases of the claim before proceeding in federal court. *See Daye,* 696 F.2d at 191; *see also Strogov v. Attorney General of the State of New York,* 191 F.3d 188, 191 (2d Cir.1999), *cert. denied,* 530 U.S. 1264, 120 S.Ct. 2723, 147 L.Ed.2d 987 (2000).

▮ Although the petitioner raised this claim on appeal, the respondent maintains that it is not exhausted because the Appellate Division found the claim "unreviewable" due to the petitioner's failure to provide a "sufficient record to establish that the special seating arrangements deprived him of the right to be present." *Bohan,* 257 A.D.2d at 443, 684 N.Y.S.2d at 515. While the Appellate Division may have wished for more details about where the parties sat during the examination of Ms. Rodriguez, the petitioner did raise both the legal and factual bases of his claim in state court: he alleged that he sat in a different room from Ms. Rodriguez during the examination thus denying him his right to be present in violation of the Sixth Amendment. Although the exact seating arrangements and the configuration of the rooms are unknown, it is clear from the state record that Mr. Bohan could both hear and see the examination of Ms. Rod-

riguez and that she could see him,[22] facts sufficient for the state court to have made a decision on the merits of the claim. Therefore, the petitioner exhausted his state court remedies.

Furthermore, the Appellate Division did reach the merits in an alternative holding, stating that "[i]n any event, the existing record establishes that defendant waived his right to be situated in closer proximity to the witness and counsel." *Id.* at 443–44, 684 N.Y.S.2d 514, 684 N.Y.S.2d at 515. However, the petitioner did not argue in state court that defense counsel failed to obtain his consent to waive his presence at the proceeding, nor did Mr. Bohan present any evidence to this effect to the Appellate Division. Nevertheless, as discussed below, the waiver issue is not dispositive of this claim; therefore, it is of no matter that the factual predicate for the waiver issue was not exhausted in state court.

2. *Merits*

█ The petitioner's Sixth Amendment claim raises four issues: whether Mr. Bohan's right to be present was violated when Ms. Rodriguez was examined in a separate room; whether Mr. Bohan validly waived his right to be present; whether harmless error analysis applies to the claim; and, if so, whether the error was indeed harmless. Because harmless error analysis does apply and the error was harmless, it is unnecessary to rule on the first two issues. *See Yarborough v. Keane,* 101 F.3d 894, 896 (2d Cir.1996).

█ Violations of the right to be present during all material stages of the trial may be subject to harmless error

analysis. *United States v. Feliciano,* 223 F.3d 102, 111–12 (2d Cir.2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1406, 149 L.Ed.2d 348 (2001); *Yarborough,* 101 F.3d at 896; *United States v. Vilella,* 49 F.Supp.2d 232, 238 (S.D.N.Y.1999); *see also Rushen v. Spain,* 464 U.S. 114, 119 n. 2, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) ("[V]iolations of the right to be present during all critical stages of the proceedings [are, in most cases] subject to harmless error analysis."). However, if the violation "so fundamentally undermine[s] the fairness or the validity of the trial," it is properly characterized as a "structural" error and is subject to automatic reversal. *Yarborough,* 101 F.3d at 897; *see also Arizona v. Fulminante,* 499 U.S. 279, 307–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "To determine whether an error is properly categorized as structural, we must look not only at the right violated, but also at the particular nature, context, and significance of the violation." *Yarborough,* 101 F.3d at 897.

Mr. Bohan's absence from the examination room during the questioning of Ms. Rodriguez certainly did not undermine the fairness or the validity of the trial. He was able to see and hear the entire interrogation of Carmen Rodriguez, and his attorney was present in the examination room. There is no indication in the record that the petitioner was impeded from consulting with counsel either before or after the examination. Accordingly, his exclusion from the examination room, assuming it was an error, is subject to harmless error analysis. *See Feliciano,* 223 F.3d at 112 (conducting portion of voir dire outside hearing of defendants subject to harmless

---

**22.** The state transcript reflects that the judge and counsel were in the interview room with Ms. Rodriguez, while the video technician, stenographer, and the defendant were in a separate room. (Tr. 217–19, Cond.Ex. Tr. 4). This indicates that the petitioner could both see and hear the examination of Ms. Rodriguez. The prosecutor also had to remind Ms. Rodriguez to look at him rather than at the petitioner, again confirming that the parties in the two rooms could see each other. (Tr. 327, 329).

error analysis where defendants present during entire jury selection process and were provided with opportunity to consult with counsel); *Yarborough,* 101 F.3d at 898 (holding brief hearing, not part of trial proper, in defendant's absence subject to harmless error standard); *Vilella,* 49 F.Supp.2d at 238 (colloquy following outburst by co-defendant in the absence of defendant and his attorney subject to harmless error where defendant given copy of transcript from meeting).

Mr. Bohan has failed to demonstrate that the alleged violation adversely affected his trial. He has not made any showing that his presence in the same room as the witness would have altered the proceeding, nor has he demonstrated that his sitting in a separate room had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *see also Almanzar v. Portuondo,* No. CV–97–1859, 1999 WL 557517, at *6 (E.D.N.Y. July 29, 1999) (harmless error if no evidence that defendant "could have done anything had he been at the hearing nor would he have gained anything by attending") (quoting *Kentucky v. Stincer,* 482 U.S. 730, 747, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)). Because Mr. Bohan has not shown that the alleged violation resulted in anything other than harmless error, this claim should be rejected.

### C. *Prosecutorial Misconduct*

The petitioner next argues that the prosecutor was improperly permitted to elicit testimony from two witnesses, Jamal Williams and Shawn Criss, that they were fearful of him. In his closing argument, the prosecutor then emphasized this testimony. Mr. Bohan also alleges that the prosecutor impermissibly shifted the burden of proof onto the defense and vouched for the testimony of another witness, Officer Vasquez, in his summation.

### 1. *Testimony Regarding Fear*

An erroneous evidentiary ruling by a state trial court judge rises to the level of a constitutional claim cognizable on federal habeas review only if it implicates the fundamental fairness of the trial. *Dowling v. United States,* 493 U.S. 342, 352–53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998); *Roberts v. Scully,* 875 F.Supp. 182, 189 (S.D.N.Y.1995). The erroneously admitted evidence is subject to harmless error analysis such that the evidence must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan,* 137 F.3d at 125 (citation omitted). The principal factors to be considered are "the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case." *Wray v. Johnson,* 202 F.3d 515, 526 (2d Cir.2000).

With regard to Mr. Williams' testimony, there is not even a threshold showing that the trial court's ruling was erroneous. It was not improper for the trial court to admit testimony about the witness' fear of the defendant since it bore on his credibility as a witness, especially given the threat Mr. Bohan had made to Mr. Williams. *See United States v. Qamar,* 671 F.2d 732, 736 (2d Cir.1982) (testimony as to death threats admissible on direct examination where determination of credibility of witnesses was central to case and defendant and government witnesses gave inconsistent accounts); *Unites States v. Cirillo,* 468 F.2d 1233, 1240 (2d Cir.1972) (permissible to elicit testimony on redirect that witness' failure to initially provide officers with complete statement was due to

death threat by defendant). The petitioner argues that there was no evidence that he had done anything to frighten the witnesses, and it was therefore improper and prejudicial to make it seem as if he had corrupted the judicial process. (Pet. Memo. at 42). However, Mr. Williams explicitly stated that Mr. Bohan had threatened to "get" him if he did not help Mr. Bohan find Junior, a threat that, according to the prosecutor, led to the death of Mr. Alvarez. (Tr. 71).

Mr. Williams was emotional throughout his testimony on cross-examination, crying at several points. He also agreed with defense counsel that he was testifying for the "sole purpose of helping [the victim's] mother." (Tr. 111). The trial judge cited to these instances, in addition to the threat Mr. Bohan had made to the witness, in allowing the testimony about Mr. Williams' fears. (Tr. 114–17).

The state court's holding is consistent with federal law that allows redirect testimony about subjective fears where "cross-examination has been used to elicit an incomplete picture which gives a distorted impression of a witness's credibility." *United States v. Panebianco*, 543 F.2d 447, 455 (2d Cir.1976); *see also United States v. Spears*, 827 F.2d 705, 708 (11th Cir.1987) ("witnesses' subjective fears and beliefs which resulted in the prior inconsistent statement" are admissible) (citing *United States v. Franzese*, 392 F.2d 954, 960 (2d Cir.1968)). Thus, the petitioner has not established that there was an erroneous evidentiary ruling.

The admission of Mr. Criss' testimony about being fearful, even if it was an evidentiary error of constitutional proportions, had a negligible effect, if any, on the jury's verdict.[23] The prosecutor asked Mr. Criss if he was scared immediately after

Mr. Criss stated that he could not identify the shooter, implying that Mr. Criss' inability to pick out the shooter arose from his fear of the defendant. (Tr. 143). Mr. Criss' testimony about his fears neither "provide[d] the basis for conviction" nor would "a reasonable doubt ... have existed on the record without it." *Dunnigan*, 137 F.3d at 125 (citations omitted). Therefore, the petitioner has not satisfied the harmless error standard.

### 2. *Prosecutor's Summation*

A writ of habeas corpus will not issue on the basis of prosecutorial misconduct during summation unless the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *see also Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998). To prevail, the petitioner "must demonstrate that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir.1994). The misconduct Mr. Bohan alleges either was not improper or did not cause sufficient prejudice.

First, a prosecutor may comment on properly admitted evidence in his closing argument. *United States v. Myerson*, 18 F.3d 153, 163 (2d Cir.1994); *see also United States v. Rivera*, 971 F.2d 876, 885 (2d Cir.1992) (prosecutor entitled to comment on the demeanor of a witness, including fact that witness appears fearful). As explained above, the testimony about Mr. Williams being fearful was permissible; therefore it was appropriate for

---

**23.** The trial court never explicitly ruled on the admissibility of Mr. Criss' testimony about being scared because defense counsel never objected to it. (Tr. 143).

the prosecutor to discuss his testimony in his summation. And since, at worst, Mr. Criss' testimony was harmless error, its reiteration in the prosecution's closing statement was equally harmless.

■■■■■ Mr. Bohan next alleges that the prosecutor implicitly shifted the burden of proof to the defense, by pointing out in his closing argument that other witnesses supposedly present in the home of Ms. Feci at the time of the murder had not been called as witnesses. But, "[o]nce a defendant comes forward with evidence, the prosecution generally may comment on his failure to call an available witness who is under his control and whose testimony may be material." *Tankleff*, 135 F.3d at 251. Thus, there was nothing improper about the prosecutor's observation that Mr. Bohan had declined to call the other people he claimed to be alibi witnesses.

■■■■■ Mr. Bohan then argues that the prosecutor's statement, "Don't forget to consider the defendant's case as to whether you believe it or not" (Tr. 524), constituted improper burden shifting because it implied that the weak defense evidence should be construed as evidence of the petitioner's guilt. Regardless of whether this statement was appropriate, the petitioner has failed to demonstrate that it prejudiced the jury to such an extent as to render the trial unfair under the harmless error standard. *See United States v. Cruz*, 797 F.2d 90, 93 n. 1 (2d Cir.1986) (prosecutor's statement that "the defense has to convince you" found to be "misstatement" but did not deprive defendant of a fair trial).

■■■■■ Finally, the petitioner claims that the prosecutor improperly vouched for Officer Vasquez's credibility when he stated, "I'll bank with you on the fact that you are going to believe Detective Vasquez over [Carmen] Rodriguez." (Tr. 521). Howev-

er, a prosecutor may comment on the evidence presented and ask the jury to draw inferences from it. *See Myerson*, 18 F.3d at 163 (attorneys have substantial latitude to suggest that inferences be drawn from evidence as long as evidence is not misstated). Therefore, Mr. Bohan has not shown that he is entitled to habeas relief based on prosecutorial misconduct.

## D. *Illegal Sentence*

The petitioner next alleges that the trial court violated his right to go to trial by imposing a harsher sentence as a result of his failure to express remorse. The respondent counters that the claim is unexhausted and meritless. In fact, it is exhausted but without merit.

### 1. *Exhaustion*

■■■■ As stated previously, to achieve exhaustion, the petitioner must inform the state court of both the legal and factual bases of the claim before proceeding in federal court. *See Daye*, 696 F.2d at 191; *see also Strogov*, 191 F.3d at 191. The respondent argues that the petitioner did not argue on appeal that his sentence violated his Fifth Amendment privilege against self-incrimination, and, therefore, this Court is barred from reviewing the claim. (Memorandum of Law in Support of Answer Opposing Petition for Writ of Habeas Corpus ("Resp.Memo.") at 33–34). However, the petitioner's state appellate brief cites the Fifth and Fourteenth Amendments and relies on federal cases that discuss both the Fifth Amendment's protection against self-incrimination and the Fourteenth Amendment's due process provisions. (Petitioner's Appellate Brief ("Pet.App.Br."), included as Exh. A in Resp.App., at 54–56); *see Daye*, 696 F.2d at 194 (exhaustion achieved where state appellate brief relies "on pertinent federal cases employing constitutional analysis").

Indeed, the petitioner's brief raises the same argument put forward in the instant habeas petition with respect to Mr. Bohan's sentence. (Pet.App. Br. at 54–57). Accordingly, this claim is exhausted.

### 2. *Merits*

██ The petitioner maintains the state court improperly imposed the maximum sentence, twenty-five years to life, in response to his continued assertion of his innocence and his failure to express remorse at sentencing. This, Mr. Bohan argues, amounts to a violation of the Fifth Amendment right against self-incrimination and the Fourteenth Amendment right to trial because the state court impermissibly used his lack of remorse as a basis for imposing a more severe sentence. (Pet. Memo. at 52–53).

██ While the Fifth Amendment provides a "safeguard against judicially coerced self-disclosure" that extends to the sentencing phase of a criminal proceeding, *Mitchell v. United States*, 526 U.S. 314, 322, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (quotation omitted), it does not bar a court from considering a defendant's lack of remorse. *Geraci v. Senkowski*, 23 F.Supp.2d 246, 267–68 (E.D.N.Y.1998), *aff'd*, 211 F.3d 6 (2d Cir.), *cert. denied*, 531 U.S. 1018, 121 S.Ct. 581, 148 L.Ed.2d 497 (2000) ("A sentencing judge may properly consider a defendant's remorse, or lack thereof, in determining a sentence. Doing so does not infringe a defendant's Fifth Amendment rights."). Indeed, courts routinely consider a defendant's failure to accept responsibility in making sentencing decisions. *See United States v. Li*, 115 F.3d 125, 134–35 (2d Cir.1997) (not improper to impose harsher sentence than originally contemplated as result of defendant's protestations of innocence where court found her conduct manipulative and defendant failed

to accept responsibility); *El v. Artuz*, 105 F.Supp.2d 242, 255 (S.D.N.Y.2000).

Nevertheless, the petitioner maintains that courts may only rely on a defendant's lack of remorse to decline to impose a more lenient sentence, but not as the basis for imposing a more severe one. The petitioner's argument fails for several reasons. First, almost all of the cases cited by the petitioner involve issues of whether the court improperly penalized defendants for not cooperating with the government following conviction. *See United States v. Rivera*, 201 F.3d 99, 101–02 (2d Cir.1999), *cert. denied*, 531 U.S. 901, 121 S.Ct. 237, 148 L.Ed.2d 170 (2000); *United States v. Oliveras*, 905 F.2d 623, 626 (2d Cir.1990); *Mallette v. Scully*, 752 F.2d 26, 30–31 (2d Cir.1984). In this case, there is no indication that the judge coerced the petitioner by offering a more lenient sentence in exchange for providing assistance to law enforcement. Rather, the judge, in commenting on the necessity for a severe punishment based on the petitioner's character and past behavior, noted that he had failed to accept responsibility for the crime. (Sent. Tr. 19). Under these circumstances, it is doubtful that there was sufficient judicial coercion to constitute a Fifth Amendment violation. *Cf. Rivera*, 201 F.3d at 101–02 (five year increase of defendant's sentence based on his refusal to cooperate with the government post-conviction violated his right to remain silent); *Oliveras*, 905 F.2d at 626 (defendant could not be denied an acceptance of responsibility reduction in offense level merely because he refused to make self-incriminating statements relating to conduct included in counts to which he had not pled guilty and which were dismissed as part of his plea agreement, and for which he had not been immunized from further prosecution).

Second, the petitioner has made no showing that Justice Wittner was imposing a more severe punishment rather than declining to grant leniency. *Compare United States v. Perez,* 904 F.2d 142, 146 (2d Cir.1990) (longer sentences imposed after third trial not result of vindictiveness), *and Mallette,* 752 F.2d at 30 (insufficient finding of enhancement where "record shows only that the judge declined to show leniency"), *with Rivera,* 201 F.3d at 101 (illegal enhancement where judge stated that "I ... regard his failure to come forward and assist the government in its investigations following his conviction in this case as affecting the point within the guideline range to which I am sentencing him.... I am attributing in my mind [five years] to his failure to assist the government postconviction"), *and Oliveras,* 905 F.2d at 626 (impermissible denial of "acceptance of responsibility" sentence reduction where defendant refused to make self-incriminating statements about crimes not relating to actual charges). Accordingly, this claim should be denied.

### E. *Ineffective Assistance of Trial Counsel*

Mr. Bohan details numerous errors supporting his claim of ineffective assistance of counsel. The respondent contends that this claim is unexhausted and should be dismissed or, in the alternative, fails on the merits.

#### 1. *Exhaustion*

The respondent argues that the petitioner should have presented this claim to the state courts in a motion filed pursuant to New York Criminal Procedure Law ("CPL") § 440. (Resp. Memo. at 31). There is no requirement, however, that a petitioner commence a collateral proceeding, such as a CPL § 440 motion. Rather, to achieve exhaustion a petitioner need only raise the claim on direct appeal, even if other state remedies remain available. *See Ylst v. Nunnemaker,* 501 U.S. 797, 805, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (prisoner "exhausted his *Miranda* claim by presenting it on direct appeal, and was not required to go to state habeas at all"). In this case, Mr. Bohan raised ineffective assistance of trial counsel in his direct appeal to the Appellate Division, and this claim was denied further review by the Court of Appeals. The petitioner has, therefore, exhausted his state remedies.

#### 2. *Merits*

In order to obtain a reversal of a conviction for ineffective assistance of counsel, a petitioner must demonstrate that: (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When reviewing trial counsel's performance, a habeas corpus court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689, 104 S.Ct. 2052. The court must not rely upon hindsight and second-guess counsel's unsuccessful trial strategy. *Id.* Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052.

With respect to the first prong of the *Strickland* test, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness.... [T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. 2052; *see also United States v. Cronic,* 466 U.S. 648, 657–58, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The "prejudice" prong of the test requires a "showing

that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," and that there is a reasonable probability that "but for" the claimed errors of counsel, the trial result would have been different. *Strickland,* 466 U.S. at 687, 694, 104 S.Ct. 2052.

In this case, Mr. Bohan argues that he was denied the effective assistance of trial counsel in three respects: (1) defense counsel's failure to file alibi notices for any of the proposed alibi witnesses; (2) his failure to advise the petitioner of his right to be present during the taking of the testimony of Carmen Rodriguez; and (3) counsel's "overall inept performance throughout the trial." (Pet. Memo. at 48). Because the petitioner's claim of ineffectiveness for failure to give notice of a proposed alibi witness is intertwined with his substantive claim that he was denied the right to present a defense, these two issues will be discussed together below. The other alleged instances of ineffective assistance did not cause sufficient prejudice to the petitioner to warrant habeas relief.

Mr. Bohan testified and filed an affidavit stating that counsel never informed him of his right to be present during the examination of Carmen Rodriguez, and that he never waived this right. (First Fed. Tr. 33–34; Affidavit of Robert Bohan dated Nov. 10, 2000, attached to Reply Memorandum of Law in Support of the Petition for a Writ of Habeas Corpus). Although this evidence, if credited, might indicate deficient performance by counsel, the petitioner has not demonstrated that his presence in the examination room would have altered the proceeding in any way. Therefore, he has not established that the alleged error gave rise to any prejudice.

*See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

The petitioner also recites several examples of the overall lack of skill of defense counsel, including his failure (1) to object to portions of the prosecution's opening statement; (2) to give an opening statement; (3) to turn over Mr. Rodriguez's statement to the prosecution as required by *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961); (4) to cross-examine Officer Vasquez about potentially exculpatory evidence; (5) to impeach Jamal Williams; (6) to call Manny Martinez as a witness; (7) to object to the prosecutor's improper summation; and (8) to request a limiting charge regarding erroneously admitted testimony. (Pet. Memo. at 48–51). The petitioner has again not established that "but for" these failings the outcome of the trial would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### F. *Preclusion of an Alibi Witness*

The petitioner claims the trial court's preclusion of the testimony of Bernardo Rodriguez deprived him of his right to compulsory process and his right to present a defense, notwithstanding the fact that the petitioner's trial counsel failed to serve an alibi notice for this witness.[24] By contrast to the claims discussed above, this one has merit.

#### 1. *Merits*

Under the Compulsory Process Clause of the Sixth Amendment, defendants have the right to present witnesses at trial. U.S. Const. Amend. VI (criminal defendants have "the right ... to have compulsory process for obtaining witnesses in his

---

**24.** The respondent concedes that this claim is not procedurally barred. (Resp. Memo. at 14).

favor"); *see also Michigan v. Lucas,* 500 U.S. 145, 149, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991); *Taylor v. Illinois,* 484 U.S. 400, 407–09, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). This right is not boundless; courts may limit the presentation of evidence in many ways, including the preclusion of testimony if the party seeking its admission has not complied with the pertinent discovery rules, such as an alibi notice statute. *Taylor,* 484 U.S. at 411, 108 S.Ct. 646 (preclusion of exculpatory testimony because of defendant's failure to comply with alibi notice statute does not violate Sixth Amendment); *see also Lucas,* 500 U.S. at 152–53, 111 S.Ct. 1743 (preclusion of evidence of defendant's own past sexual conduct with victim because of defendant's failure to comply with notice-and-hearing requirements of rape-shield statute not per se violation of Sixth Amendment). Indeed, in *Taylor,* the Supreme Court found it "entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony" where the failure to comply with an alibi notice statute was "willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence." 484 U.S. at 415, 108 S.Ct. 646.

In determining "the fundamental character of the defendant's right to offer the testimony of witnesses in his favor," the court must balance "[t]he integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *Id.* at 414–15, 108 S.Ct. 646 (footnote omitted); *see also Noble v. Kelly,* 246 F.3d 93, 99 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197, 151 L.Ed.2d 139 (2001).

The Second Circuit's recent decision in *Noble* is particularly instructive because its fact pattern is similar to that presented in this case. In *Noble,* the petitioner was found guilty of a murder that occurred outside a bar. At trial, the defense offered a witness who would testify that he was inside the bar with the petitioner at the time of the murder. The prosecution objected to the witness because no alibi notice had been given. Defense counsel countered that the witness was not an alibi witness because the complaint specified the crime scene as the vicinity of the bar, and the witness would place the petitioner in the bar, which was at the scene of the crime. The trial court found that the crime scene was only in front of the bar, and excluded the witness based on defense counsel's failure to give notice under the statute. *Id.* at 96. On appeal, the Appellate Division found that even if the judge committed error by precluding the witness it was "harmless in view of the overwhelming evidence of guilt." *People v. Noble,* 209 A.D.2d 735, 735–36, 618 N.Y.S.2d 123, 124 (3d Dep't 1994).

On habeas review, the Second Circuit focused on the potential prejudice to the prosecution and the willfulness of the defense attorney's actions. *Noble,* 246 F.3d at 99–100. It concluded that where "the state trial court could have used less onerous sanctions (such as an adjournment) to minimize any prejudice to the prosecution, . . . a finding of willfulness was therefore required to justify the exclusion of [the precluded witness'] testimony." *Id.* at 100. Because the state court had failed to make such a finding, the Second Circuit found that it had violated the petitioner's Sixth Amendment rights. *Id.*

In this case, no evidence was presented either at trial or at the hearing held in this Court from which it could be inferred that Mr. Rawlins' failure to give notice to the

prosecution of Bernardo Rodriguez was willful or motivated by a desire to gain a tactical advantage. Although Mr. Rawlins certainly did not demonstrate good cause for the failure to give timely notice, *cf. Anderson v. Groose*, 106 F.3d 242, 246 (8th Cir.1997) (not willful where no evidence that defense counsel knew name of alibi witness before morning of trial), the inability to provide a good excuse does not mean that defense counsel acted willfully. *See Noble*, 246 F.3d at 99–100; *Escalera v. Coombe*, 852 F.2d 45, 48 (2d Cir.1988).

The petitioner, citing to *Noble*, 246 F.3d 93, claims that Mr. Rawlins' failure to comply with the statute was due to a misinterpretation of the law and, therefore, was not willful. (Post–Hearing Memorandum of Law in Support of Petition for Writ of Habeas Corpus at 2–3). After the trial judge indicated that she was going to exclude Mr. Rodriguez from testifying, Mr. Rawlins changed tactics and argued that his failure to comply with the alibi notice statute was due to his misreading of the law and his mistaken belief that Mr. Rodriguez was not an alibi witness because the time of the murder had not been established and Mr. Rodriguez's statement made no mention of the petitioner's whereabouts at the time of the crime. (Tr. 309). This post hoc argument is unconvincing. The record amply supports the conclusion that Mr. Rawlins' failure to come forward earlier with Mr. Rodriguez as an alibi witness was due to a combination of his last minute trial preparation, forgetfulness, and ineptitude, not to any misinterpretation of the law.

Indeed, Mr. Rawlins suggested that he simply forgot about Mr. Rodriguez after they met in March 1994, until the third day of trial when the prosecution concluded its case and the defense began its presentation. That morning, Mr. Rawlins apparently received a phone call from another alibi witness, which caused him to review his file and discover Mr. Rodriguez's statement. (Tr. 297, 345). Mr. Rawlins reiterated this rendition of the events at the hearing held before this Court. (Second Fed. Tr. 4, 11).[25]

The respondent argues that Mr. Rawlins was aware of Mr. Rodriguez and intended to call him as a witness by July 5, 1995, seven days before the prosecution rested, and yet still failed to submit an alibi notice. The respondent relies on Mr. Silberg's testimony from the hearing held in federal court, in which he said that shortly before jury selection began, Mr. Rawlins told him that he wanted to call some alibi witnesses and that not all of them had testified before the grand jury. Mr. Silberg expressed his displeasure with Mr. Rawlins' failure to comply with the notice statute, and informed Mr. Rawlins he was not concerned about the witnesses with whom he was familiar, but that they would have to discuss the matter with the judge on the record. Mr. Silberg did not recall whether Mr. Rawlins specifically mentioned Mr. Rodriguez's name. (First Fed. Tr. 40–41). The only indication of this conversation in the state record from July 5 is the following:

THE COURT: The Defendant testified and served alibi notice?

MR. SILBERG: Correct.

---

25. In attempting to discredit Mr. Rawlins' protestations of forgetfulness, the respondent misreads the record. (Resp. Post–Hearing Memo. at 14). The respondent claims that Mr. Rawlins stated that he had forgotten about *all* of the alibi witnesses until he discovered Mr. Rodriguez's statement in his file. This is simply unsupported by the record. As noted previously, Mr. Rawlins informed the court before jury selection began that he would be putting on alibi witnesses. Mr. Rawlins only claimed that he had forgotten about Mr. Rodriguez until the day before the *Dawson* hearing.

THE COURT: Is there going to be an alibi again?

MR. RAWLINS: He agreed to accept a late notice.

(Voir Dire Tr. at 4).[26] Despite this colloquy, Mr. Rawlins never did serve alibi notice for any of the alibi witnesses. Even if Mr. Rawlins had intended to call Mr. Rodriguez by July 5, his failure to do so does not appear to be motivated by any strategic concerns, but was more likely due to his general incompetence.

Moreover, whether Mr. Rawlins became re-acquainted with Mr. Rodriguez immediately before the trial or five days later, as Mr. Rawlins stated at the *Dawson* hearing, is of little importance to this analysis because the state court never made any finding of willfulness nor inquired into whether defense counsel's "failure to comply with the notice requirement was designed to frustrate the truth-seeking function of the trial." *Noble v. Kelly*, 89 F.Supp.2d 443, 457 (S.D.N.Y.2000), *aff'd*, 246 F.3d 93 (2d Cir.), *cert. denied*, 534 U.S. 886, 122 S.Ct. 197, 151 L.Ed.2d 139 (2001). After the prosecution objected to Mr. Rodriguez testifying, the state court precluded the witness, finding that it was "a clear violation of the statute." (Tr. 308). The court did not make any specific determination about Mr. Rawlins' motivation in not coming forward sooner with information about Mr. Rodriguez. Again, on appeal, the state court did not probe this issue and merely found that the trial court properly exercised its discretion in precluding Mr. Rodriguez from testifying, since defense counsel failed to comply with the statute and the prosecution was not given an opportunity to investigate Mr. Rodriguez. Where the state court has not made any finding as to willfulness, as is the case here, the petitioner is denied his right to present a defense. *See Noble*, 246 F.3d at 100.

Nevertheless, the respondent asserts that in *Noble* the Second Circuit left open the question of whether a finding of willfulness is necessary for a Sixth Amendment violation. (Resp. Post–Hearing Memo. at 15). The respondent goes on to argue that the court should consider the cumulative nature of Mr. Rodriguez's testimony, his bias, and his lack of credibility in determining whether the petitioner's Sixth Amendment rights were violated, and that all of these factors demonstrate that there was no constitutional infirmity at trial. (Resp. Post–Hearing Memo. at 17–22). These factors, however, are more properly addressed in the harmless error analysis. More importantly, the respondent misconstrues *Noble*. There the court stated,

> We ... need not decide whether, and to what extent, a finding of willfulness is required in every case.... For purposes of the present case, we need only conclude that where prejudice to the prosecution can be minimized with relative ease, a trial court's exclusion of alibi testimony must be supported by a finding of some degree of willfulness in defense counsel's violation of the applicable discovery rules.

*Noble*, 246 F.3d at 100 n. 3. Here, the same circumstances are present: the trial court could have minimized any prejudice to the prosecution with a short adjournment,[27] and therefore some finding of willfulness was necessary. The respondent counters that unlike the excluded witness in *Noble*,

**26.** "Voir Dire Tr." refers to the transcript from the voir dire proceeding.

**27.** In precluding Mr. Rodriguez, the trial judge halted the proffers made by counsel about Mr. Rodriguez's fitness to testify. (Tr.

361). Neither the judge nor either party suggested adjourning the trial to provide the prosecutor with the opportunity to interview and further investigate Mr. Rodriguez.

Mr. Rodriguez was completely unknown to the prosecution prior to the *Dawson* hearing. (Resp. Post–Hearing Memo. at 16). But, "the prosecution in this case had a wealth of evidence about the place where the defendant claimed to have been and about the other witnesses who might contradict [Mr. Rodriguez's] testimony." *Noble*, 89 F.Supp.2d at 457. Furthermore, Mr. Rodriguez was proffered as a witness "after the close of the prosecution's case [and so] no prosecution witnesses would have been inconvenienced by a brief delay." *Id.* Accordingly, the trial court's exclusion of the alibi evidence violated the petitioner's rights under the Compulsory Process Clause: Mr. Rawlins' oversight is more consistent with incompetent advocacy—as the trial court hinted (Tr. 305–06)—than with intentional manipulation, the state court failed to make any finding to the contrary, and any prejudice to the prosecution could easily have been avoided. *Compare Escalera*, 852 F.2d at 48 (inability to provide "good excuse" for failure to list alibi witness did not show that conduct was "willful" or motivated by desire to obtain tactical advantage), *Noble*, 89 F.Supp.2d at 457 (witness improperly excluded where "failure to file the notice appears to have been motivated by a genuine, albeit apparently erroneous, belief that [the witness'] testimony was not an alibi"; and no showing that defense counsel's position taken in bad faith), *and Poo v. Hood*, No. 89 Civ. 7874, 1992 WL 30617, at *4 (S.D.N.Y. Feb. 12, 1992) (witness improperly excluded where no finding of willfulness), *with Eckert v. Tansy*, 936 F.2d 444, 446–47 (9th Cir.1991) (witness properly excluded where defendant did not want notice given until he had contacted the witness), *and Chappee v. Vose*, 843 F.2d 25, 30 (1st Cir.1988) (witness properly excluded where lawyer's explanation for failure to comply with statute was disingenuous and "counsel [was] armed to the teeth for

the cross-examination, [and] lawyer had prepared a legal memorandum for submission to the judge dealing with their expected testimony"). *But see Byrd v. Walker*, No. 98 Civ. 55, 2000 WL 565193, at *4 (S.D.N.Y. May 9, 2000) (although no finding of willfulness, testimony properly excluded where defense represented that there would be no alibi defense before trial but shortly before jury selection defense raised the "possibility" of calling alibi witnesses and defense given opportunity at trial to challenge order of preclusion of alibi witnesses but never pursued it).

### 2. *Standard of Review for Granting Habeas Relief*

With the enactment of the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), federal courts may not grant a writ of habeas corpus unless the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1); *see also Noble*, 246 F.3d at 98. However, this deference is only required where the state court "adjudicated [the claim] on the merits," 28 U.S.C. § 2254(d); otherwise the pre-AEDPA, *de novo* standard of review applies. *Noble*, 246 F.3d at 98. Although in this case the Appellate Division never explicitly referred to the Compulsory Process Clause of the Sixth Amendment or to federal caselaw, there is no suggestion that it rejected the petitioner's claim on non-substantive grounds. Accordingly, it appears to have been adjudicated on the merits. *See Sellan v. Kuhlman*, 261 F.3d 303, 314 (2d Cir.2001). That issue need not be definitively determined, however, since the result is the same whether the pre-AEDPA or post-AEDPA standard is used. *See Washington v. Schriver*, 255 F.3d 45, 48 (2d Cir.2001); *Noble*, 246 F.3d at 98.

The Supreme Court recently differentiated between § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses. *Williams v. Taylor*, 529 U.S. 362, 405–08, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). It found that a state court decision is "contrary to" federal constitutional law if the court either "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." *Id.* at 405, 120 S.Ct. 1495. The "contrary to" clause does not, however, encompass state court decisions where the court applies the correct legal rule, no matter how erroneous or unreasonable the application. *Id.* at 406–07, 120 S.Ct. 1495. In contrast, a state court decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or if the state court either "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407, 120 S.Ct. 1495.

In this case, the state court did not employ the correct legal principle; therefore, the "contrary to" portion of § 2254(d)(1) applies. By not considering "whether defense counsel had wilfully or in bad faith failed to comply with the alibi notice requirement," *Noble*, 89 F.Supp.2d at 461, the Appellate Division did not follow Supreme Court precedent as established in *Taylor*, 484 U.S. at 415, 108 S.Ct. 646. The state court merely denied the claim based on its discretion under the state alibi notice statute and the inability of the prosecution to conduct a complete investigation of Mr. Rodriguez. *Bohan*, 257 A.D.2d at 443, 684 N.Y.S.2d at 514. "The court's error, therefore, does not lie in its application of the *Taylor* standard to the particular facts of this case; it lies in the fact that the court applied the wrong standard." *Noble*, 89 F.Supp.2d at 461. Indeed, the state court both "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law" and "confront[ed] facts that [we]re materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to [it]." *Williams*, 529 U.S. at 405, 120 S.Ct. 1495.

Even if the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1) were controlling,[28] it would not alter the result. There is simply no basis for concluding that Mr. Rawlins' failure to file an alibi notice for Mr. Rodriguez was willful or motivated by any tactical concerns. Therefore, the Appellate Division's denial of the claim was an "unreasonable application" of established federal law.

### 3. *Harmless Error*

Despite this constitutional infirmity, habeas relief is only available if the error is not harmless. *See Brecht*, 507 U.S. at 623, 113 S.Ct. 1710; *Noble*, 89 F.Supp.2d at 457, 458 n. 15 (exclusion of testimony based on failure to comply with alibi notice

---

**28.** The state court's discussion of the preclusion of Mr. Rodriguez could be interpreted as only addressing the state law issue—violation of the alibi notice statute—and the summary denial of all remaining claims at the end of the Appellate Division's decision as encompassing the petitioner's constitutional claim.

*See Bohan*, 257 A.D.2d at 444, 684 N.Y.S.2d at 515 ("We have reviewed and rejected defendant's remaining contentions."). When a claim is summarily denied by the state court, the "unreasonable application" clause applies. *See Sellan*, 261 F.3d at 314–15, n. 6.

statute is trial error subject to harmless error review). The standard for harmlessness is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quotations and citations omitted).[29] If the court is in "grave doubt" whether an error is harmless, the writ of habeas corpus must issue. *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Moreover, "grave doubt" exists where "the matter is so evenly balanced that [the judge] feels himself in virtual equipoise as to the harmlessness of the error." *Id.,* 513 U.S. at 435, 115 S.Ct. 992.

With regard to constitutional violations of the right to present witnesses, the Second Circuit recently restated the test:

> [W]hether the exclusion of [witnesses'] testimony violated [the defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist. In a close case, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. On habeas review, trial errors are subject to lenient harmless error review. The creation of otherwise non-existent reasonable doubt satisfies the substantial and injurious standard.

*Washington,* 255 F.3d at 56–57 (quoting *Jones v. Stinson,* 229 F.3d 112, 120 (2d Cir.2000) (internal quotations omitted)).

In this case, two witnesses testified that they were with Mr. Bohan at his home when the murder took place, which was minutes before 10:25 p.m. (Tr. 309). Roberto Cruz first testified that he last saw Mr. Bohan a little after 10:00 p.m. when he went to say goodnight to Mr. Bohan's grandmother. (Tr. 263). Mr. Cruz stayed with her until approximately 10:05 or 10:10 p.m. and then left the apartment with several of his friends at around 10:15 p.m. (Tr. 262–64). Later, on cross-examination he admitted that he was not sure when he left but that it was before 10:30 p.m. because when he arrived home, across the street, the news was still on the television. Julia Feci, the petitioner's grandmother, presented testimony consistent with that of Mr. Cruz: she said Mr. Cruz left the apartment either at 10:15 or 10:30 p.m. (Tr. 232–33, 243–44), and Mr. Bohan came into her bedroom to watch television sometime afterwards. On direct examination she claimed Mr. Bohan joined her at 10:30 p.m. and stayed until the end of the program at 11:00 p.m. (Tr. 233–34), but on cross-examination changed her testimony and said he came in at 10:45 p.m. and

---

29. In finding a constitutional error not harmless on direct review, a state appellate court must determine that it was harmless beyond a reasonable doubt in accordance with *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Noble,* 246 F.3d at 101 n. 5. In contrast, federal courts have employed the standard set forth in *Brecht* to make such determinations on habeas review. However, the Second Circuit in *Noble* recently questioned the continued validity of *Brecht:* "After AEDPA, the question arises whether a federal habeas court should continue to apply *Brecht* or determine instead whether the state court's decision was 'contrary to, or involved an unreasonable applica-

tion' of *Chapman.* 28 U.S.C. § 2254(d)(1)." 246 F.3d at 101 n. 5.

Nevertheless, the more stringent AEDPA standard only applies where the state appellate court has "adjudicated [the claim] on the merits." *Noble,* 246 F.3d at 98; *Washington,* 255 F.3d at 55 (2d Cir.2001). In this case, it is unnecessary to resolve the issue presented in *Noble,* namely whether to apply the *Brecht* standard or the AEDPA standard, because the state court did *not* adjudicate the harmlessness issue on the merits. The Appellate Division did not find a constitutional violation and, as a consequence, never addressed whether any error was harmless.

remained until 11:00 p.m. (Tr. 244–45, 247). She also admitted on cross-examination that she did not look at a clock during the night in question, but could tell time by the commercial breaks in the one-hour television program she regularly watched. (Tr. 244–46). In his summation, the prosecutor argued that the testimony from the two alibi witnesses was not inconsistent with the prosecution's theory of the case, because neither could account for the petitioner's whereabouts from a little after 10:00 to 10:45 p.m.; thus giving him enough time to commit the murder:

> The most important thin[g] about Ms. [Feci] in the context of defendant's case, I refer to her, and you should keep in mind the one thin[g] about her is she was too late, what I mean is she can say she saw defendant until 10:45 . . . . She says 10:45, the murder occurred four or five blocks away at 10:25, so there is enough time to commit the murder and get back.

> She can say she saw him [at] 10:30, 10:25, 10:15, times that would mean more to you because it will tell you he could not have done it if she saw him at that time. She does not see him until 10:45. Too late.

> You heard from Roberto Cruz, too early. He said he's playing video games and leaves defendant around 10:00 to go into the grandmother's room, does not see him after that, talks to the grandmother and goes home. So Cruz is too early. Certainly the defendant could have left at ten o'clock and gone down to 167 Street.

> When you put the two witnesses together and Mr. Cruz also was never sure of time until he gets home [at] 10:30. Put the two witnesses together, what you get is too early and too late.

(Tr. 517–18).

Mr. Rodriguez's testimony places the petitioner at home during the time period unaccounted for by other witnesses, thus providing critical support to Mr. Bohan's alibi and undermining the prosecution's argument. During the *Dawson* hearing and again in the hearing held in federal court, Mr. Rodriguez stated that he stopped by 171st Street at 10:05–10:10 p.m. after he finished work. (Tr. 283–84; First Fed. Tr. 70). He found Mr. Cruz and several other friends outside Mr. Bohan's apartment building. They relayed to him what had happened earlier, at which point Mr. Rodriguez looked up and saw Mr. Bohan and his grandmother through the second-floor window at approximately 10:10–10:15 p.m. (Tr. 285; First Fed. Tr. 72–73, 91). He also confirmed that Mr. Cruz departed for home soon after Mr. Rodriguez arrived on the block. (Tr. 285; First Fed. Tr. 95). Mr. Rodriguez remained outside Mr. Bohan's building until 11:10–11:15 p.m. (Tr. 284; First Fed. Tr. 74).

Mr. Rodriguez's testimony would have rehabilitated Ms. Feci's story as to when Mr. Bohan came into her room and began watching television with her, specifically that he came in at 10:15 p.m., not at 10:45 p.m., and stayed with her for the remainder of the television program. Even the respondent has conceded that Mr. Rodriguez's testimony, if believed, was not cumulative. (First Fed. Tr. 8).[30]

In sum, Mr. Rodriguez's testimony "bore on an issue that [was] plainly critical to the jury's decision; . . . was material to the establishment of the critical fact [and was not] instead . . . cumulative; and . . . [concerned issues] emphasized in argu-

---

**30.** Although respondent's counsel made this concession during the hearing in this Court, the respondent's subsequent brief seeks to retract it. (Resp. Post–Hearing Memo. at 2)

ments to the jury," which are all factors weighed in determining the effect of improperly admitted evidence. *Wray*, 202 F.3d at 526 (quotations and citations omitted). Furthermore, in at least one case in this district, a court found the error not to be harmless where, as in the instant case, there was contradictory identification testimony and inconsistent testimony from alibi witnesses, and the excluded testimony provided crucial support to the petitioner's alibi. *Noble*, 89 F.Supp.2d at 458–59; *cf. Poo*, 1992 WL 30617, at *5 (harmless error where complaining witness who identified petitioner knew petitioner well and had no motive to lie; excluded alibi witnesses were interested witnesses; excluded witness' statement contradicted testimony by complaining witness and police testimony would have weakened value of her testimony).

The respondent argues that Mr. Rodriguez's testimony can be viewed as either cumulative because he, like Mr. Cruz and Ms. Feci, is a friend of the petitioner's, or as unreliable, because the other statements made to the police by the petitioner's friends made no mention of Mr. Rodriguez and contradicted his chronology of the events on the night of the murder. (Resp. Post–Hearing Memo. at 17, 19–22). However, the degree to which Mr. Rodriguez's interest affects his credibility is a question for a jury, not this Court. *See United States v. Doyle*, 130 F.3d 523, 543 (2d Cir.1997) ("it is the role of the jury—not the court—to assess the credibility of witness testimony"); *see also Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir.1994). Similarly, the inconsistencies between Mr. Rodriguez's statements and those made by other witnesses is a matter of credibility not reliability. The prosecution is free to call Jason, Angel, and Albert—the petitioner's friends who claimed to have been at his apartment the night of the murder—or to use their statements to impeach Mr.

Rodriguez and call into doubt his recollection of the events of January 12, 1993. Moreover, Mr. Rodriguez is not an inherently incredible witness: he is a college graduate; he has no criminal history other than a minor infraction which was dismissed; he is now an applicant for a position as a police officer; and he has not wavered in his rendition of the critical events.

Because exclusion of Mr. Rodriguez's testimony was contrary to clearly established federal law and this error was not harmless, Mr. Bohan's petition should be granted on the ground that his conviction was obtained in violation of the Compulsory Process Clause.

### 4. *Ineffective Assistance Relating to the Alibi Notice*

Based on the same facts, Mr. Bohan argues that he was denied effective assistance of counsel when his attorney failed to provide notice of alibi witnesses. The decision to pursue a certain defense strategy and to call certain witnesses in support of that theory of the case is certainly a tactical decision, and generally not entitled to habeas relief. *See Noble*, 89 F.Supp.2d at 462. In many cases courts have rejected habeas claims alleging that trial counsel failed to present alibi testimony. *See id.* (citing cases). In those cases the courts were faced with trial counsel's failure to pursue a particular strategy, namely an alibi defense. In this case, however, defense counsel had decided to pursue an alibi defense and was only able to put on two of the three alibi witnesses because of his failure to comply with the alibi notice statute. As discussed previously, "[i]n no sense, can that failure be attributed to a strategic choice." *Id.* at 463. Unlike defense counsel in *Noble*, whose failure to give alibi notice was due to a misinterpretation of the notice statute, Mr. Rawlins'

failure to provide notice was caused by his sheer ineptitude. He appears to have believed that the prosecutor, out of good-will or in the spirit of cooperation, would simply allow him to present alibi witnesses without notice. (Tr. 304–10). In addition, with regard to Ms. Feci and Mr. Cruz, he informed the court that he would provide alibi notices and yet, without explanation, failed to do so. (Voir Dire Tr. at 4). This behavior clearly falls "outside of the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

With regard to the second prong of the *Strickland* analysis, the petitioner has also met his burden. Although Mr. Bohan did not suffer any prejudice as a result of Mr. Rawlins' failure to file notice for Ms. Feci and Mr. Cruz because they both were allowed to testify, the preclusion of Mr. Rodriguez deprived the petitioner of a critical witness who would have provided testimony closing any time gap in the alibi. Finally, it is more than a "reasonable probability" that the trial result would have been different "but for" the errors of Mr. Rawlins, thus depriving the petitioner of a fair trial. *Id.* at 694, 104 S.Ct. 2052.

As previously discussed, if the state court employed the correct legal principle, no matter how erroneously, the "unreasonable application" clause applies, while if the state court utilized an incorrect legal standard, the federal habeas court must use the "contrary to" analysis. *Williams,* 529 U.S. at 406–07, 120 S.Ct. 1495.[31] The state court in this case found that the "defendant received meaningful representation. Counsel's alleged errors could not have deprived defendant of a fair trial. (*People v. Benevento,* 91 N.Y.2d 708, 713–

714, 674 N.Y.S.2d 629, 697 N.E.2d 584 [ (1998) ] )." *Bohan,* 257 A.D.2d at 444, 684 N.Y.S.2d at 514. In reaching its decision the Appellate Division relied on state constitutional analysis, which is more expansive than the *Strickland* standard. As the New York Court of Appeals explained in *Benevento,*

> the [state constitutional] claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case.... Thus, whether defendant would have been acquitted of the charges *but for* counsel's errors is relevant, but not dispositive under the State constitutional guarantee of effective assistance of counsel.

91 N.Y.2d at 714, 674 N.Y.S.2d at 633, 697 N.E.2d 584 (emphasis added). While the state analysis is not identical to *Strickland,* it cannot be said to be "diametrically different" from the federal constitutional analysis. *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. Rather, the state constitutional protection extends to those errors that would be federal constitutional violations under *Strickland* and its progeny and also to some errors that would not entitle a defendant to relief under federal law. Given that the state constitutional protection encompasses the federal Constitution's guarantee of effective assistance of counsel, the state court's decision was not "contrary to" Supreme Court precedent and the "unreasonable application" clause, therefore, governs this analysis.

The state court's application of clearly established federal law in denying the petitioner's ineffective assistance claim on appeal was objectively unreasonable. *See Williams,* 529 U.S. at 409, 120 S.Ct. 1495

---

**31.** Again, it is unnecessary to decide whether the claim was adjudicated on the merits thus triggering the AEDPA's more deferential standard, because the result is the same under either the *de novo* standard or the provisions of the AEDPA. *See Noble,* 246 F.3d at 98; *Washington,* 255 F.3d at 48.

("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."). There was no reasonable justification for its conclusion that the preclusion of Mr. Rodriguez did not result in the deprivation of a fair trial for the petitioner. *See id.* at 411, 120 S.Ct. 1495 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."). Accordingly, trial counsel's performance was constitutionally ineffective and provides a second ground for issuance of a writ of habeas corpus.

*Conclusion*

Because the preclusion of alibi testimony violated the Compulsory Process Clause and defense counsel's failure to comply with the alibi notice statute deprived the petitioner of effective assistance of counsel, Mr. Bohan's petition for a writ of habeas corpus should be granted. Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Victor Marrero, Room 414, 40 Foley Square, New York, New York 10007, and to the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.